**Richard NIXON, Petitioner,**

v.

**Honorable Charles R. RICHEY, United States District Court for the District of Columbia, Respondent.**

**No. 75–1063.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1975.

Decided Feb. 14, 1975.

Herbert J. Miller, Jr., Washington, D. C., argued the motion for petitioner. Raymond G. Larroca, William H. Jeffress, Jr., and R. Stan Mortenson, Washington, D. C., were on the motion for petitioner.

Irwin Goldbloom, Deputy Asst. Atty. Gen., argued for the Administrator of General Services and the United States of America. Carla A. Hills, Asst. Atty. Gen., Irving Jaffee, Deputy Asst. Atty. Gen., and Earl J. Silbert, U. S. Atty., were on the pleading filed in the cause by those parties.

Peter M. Kreindler, Counsel to the Sp. Prosecutor, Watergate Sp. Prosecution Force, for the Sp. Prosecutor as amicus curiae. Henry S. Ruth, Jr., Sp. Prosecutor, and Kenneth S. Geller, Asst. Sp. Prosecutor, were on the pleadings filed in the cause by the Sp. Prosecutor.

Robert E. Herzstein, Washington, D. C., argued for The Reporters Committee for the Freedom of the Press, and others, as amici curiae. Andrew S. Krulwich and Mark J. Spooner, Washington, D. C., were on the pleadings filed in the cause by The Reporters Committee for the Freedom of the Press, and others.

William A. Dobrovir, Washington, D. C., argued for Jack Anderson as amicus curiae. Andra N. Oakes, Washington, D. C., was on the pleadings filed in the cause by Jack Anderson.

Leon Friedman, of the bar of the Court of Appeals of New York, pro hac vice by special leave of the Court, argued for Lillian Hellman, and others as amici curiae. Melvin L. Wulf, New York City, was on the pleading filed in the cause by Lillian Hellman, and others.

Before BASTIAN, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

PER CURIAM:

Petitioner filed in this court a petition for a writ of mandamus directing a District Judge to immediately grant a pending application for a three-judge court to hear and determine a case challenging the constitutionality of an act of Congress, and instructing the judge to give that case priority over three consolidated cases pending before him as a single judge. In a prior opinion,[1] we held that the judge had to rule on the three-judge application and had to defer the priority question to the three-judge court if convened. We denied the requested writ, however, as unnecessary to compliance with those holdings.

The judge's subsequent release of an opinion, without accompanying order, deciding the consolidated cases has prompted petitioner to seek reconsideration of our earlier refusal of a writ. A three-judge court has now been convened to initially determine whether it properly should pass on the constitutional challenge, and no further action by us is needed in that regard. Since we had, however, stayed entry of any order implementing the opinion in the consolidated cases, the present controversy relates to whether the stay should be continued.

We find that our stay must remain in effect temporarily for protection of the litigation in which the challenge is made. We leave, as we did before, resolution of the priority question for the three-judge court if it rules that it is to function in that case. Our stay will terminate when the exigencies demanding it disappear. Our reasons for these decisions follow.

I

On December 19, 1974, the Presidential Recordings and Materials Preservation Act[2] became law. Title I of the Act

---

1. Nixon v. Richey, 168 U.S.App.D.C. ——, 513 F.2d 427 (1975).

2. Pub.L. No. 93–526, 88 Stat. 1695 (1974).

directs the Administrator of General Services to obtain possession and control of specified tape recordings of conversations held, and other historical matter generated, during petitioner's tenure as President of the United States.[3] These the Administrator is to protect and preserve, subject to regulations to be promulgated to govern access by petitioner, governmental agencies and departments, and members of the public.[4] The Act also authorizes payment of just compensation upon a judicial finding that any individual has been deprived of private property by any provision of Title I.[5]

On the day after the Act went into effect, petitioner brought an action in the District Court to enjoin its enforcement permanently on grounds that it transgressed the Federal Constitution.[6] At the same time, petitioner asked that a three-judge court be convened to hear and determine the constitutional claims asserted therein.[7] The case was assigned to the respondent District Judge, the Honorable Charles R. Richey, before whom three consolidated cases involving the presidential materials were then pending.[8] The contest in those cases extended to ownership of the materials and privilege against their disclosure, issues also involved in petitioner's constitutional challenge.[9] On January 3, 1975, petitioner moved for a preliminary injunction against operation of the Act.

During the five weeks following institution of the challenge case on December 20, petitioner—on five separate occasions, we are told—requested Judge Richey to initiate the statutory procedure leading to the formation of a district court of three judges.[10] The record reveals that during that period Judge Richey was preoccupied with the consolidated cases,[11] and planned to complete work on them before addressing the challenge case.[12] On January 23, 1975, Judge Richey informed counsel by letter that:

sumptions as to ownership of and privilege respecting the presidential materials.

---

3. Presidential Recordings and Materials Preservation Act § 101, 88 Stat. 1695 (1974).

4. *Id.* §§ 101 to 104, 88 Stat. 1695 (1974). The presidential materials are made amenable to judicial process and available for use in any judicial proceeding, subject to any rights, defenses or privileges the Federal Government or any individual may invoke, with priority to any request therefor by the Office of Watergate Special Prosecution Force. *Id.* § 102(b), 88 Stat. 1696 (1974). Petitioner or his designee is granted access to the materials for purposes consistent with the provisions of Title I, subsequent and subject to the Administrator's regulations. *Id.* § 102(c), 88 Stat. 1696 (1974). Governmental agencies and departments in the Executive Branch are also allowed access subject to the regulations. *Id.* § 102(d), 88 Stat. 1696 (1974).

5. *Id.* § 105(c), 88 Stat. 1698 (1974).

6. Nixon v. Administrator of Gen. Servs., Civ. No. 74–1852 (D.D.C.), filed Dec. 20, 1974.

7. See 28 U.S.C. §§ 2282, 2284 (1970).

8. Nixon v. Sampson, Civ. No. 74–1518 (D.D. C.), filed Oct. 17, 1974; Reporters Comm. for Freedom of the Press v. Sampson, Civ. No. 74–1533 (D.D.C.), filed Oct. 21, 1974; and Hellman v. Sampson, Civ. No. 74–1551 (D.D. C.), filed Oct. 24, 1974.

9. Contentions petitioner advances in the challenge case are predicated upon his own as-

10. See 28 U.S.C. § 2284(1) (1970).

11. In a response submitted to the petition for mandamus, Judge Richey stated that the consolidated litigation "consumes more than a complete legal-sized file drawer of pleadings, briefs and memoranda of law," and "has had the constant and almost daily attention of the Court since its inception. . . ." "In fact," he added, "two weekends and the Christmas recess were entirely spent right here in this Courthouse working on this very matter." The record discloses that in contrast to his diligent efforts in the consolidated cases, Judge Richey devoted virtually no attention to petitioner's suit challenging the validity of the Act.

12. When the Act was signed into law and the challenge suit was filed, motions for a preliminary injunction were pending in the consolidated cases. On October 31, Judge Richey had denied petitioner's motion to consolidate hearings on these motions with trial on the merits, but on November 15, at a hearing on the motions, he had indicated that he might prefer to rule on the merits rather than solely on the issue of preliminary injunctive relief. After passage of the Act, Judge Richey decided upon complete resolution of the consolidated cases, and at his invitation several parties moved for full or partial summary judgment.

Due to unforeseeable circumstances, the court's opinion in the consolidated cases is not finished at this time. Until this opinion and order are finished, and the court is hopeful of having it done early next week, the court will not be able to turn its attention to the above-entitled cause. That will be the next order of business.[13]

Late in the afternoon of January 28, petitioner filed in this court a petition for a writ of mandamus directing Judge Richey to grant the application for a three-judge court immediately and give the challenge case priority over the consolidated cases.[14] The petition called attention to Judge Richey's letter and its indication that the decision in the consolidated cases was imminent. Recognizing the possible consequence of that action upon petitioner's constitutional challenge, a matter we elucidate later,[15] we gave the matter all the expedition we could command. On January 29, we called for responses,[16] by the close of the next day. We deliberated promptly after receipt of the responses, and filed an opinion and order on the morning of January 31.

In our opinion, we concluded that Judge Richey erred in delaying action on the three-judge request[17] and in ignoring the statutory priority[18] of the challenge case.[19] We held that Judge Richey "must decide and decide now," whether to call for a three-judge court,[20] stating carefully that "[w]e intimate[d] no view as to what in this regard [he] should decide."[21] On the matter of priority, we pointed out the danger of first deciding the consolidated cases,[22] and observed that "[t]he interests of justice would seem to require that disposition of [those] cases be held up at least until the three-judge question is put to rest."[23] We noted specifically that "delay in the issuance of the opinion in the consolidated cases . . . should properly be settled by the three-judge court."[24]

Although thus concluding, and acknowledging the propriety of the mandamus remedy in the circumstances,[25] we saw no occasion for issuance of a writ. "No final action on the petition at hand is necessary," we stated;[26] "[w]e assume that the District Judge, now advised of the relevant law, will proceed in accordance with this opinion."[27] In so doing,

---

13. The letter was written to inform counsel of cancellation of a hearing previously scheduled on petitioner's motion for a preliminary injunction in the challenge case.

14. These requests rested upon 28 U.S.C. §§ 2282, 2284 (1970), and the Presidential Recordings and Materials Preservation Act § 105(a), 88 Stat. 1698 (1974).

15. See Part II, *infra.*

16. See Fed.R.App.P. 21(b).

17. Nixon v. Richey, *supra* note 1, 168 U.S.App. D.C. at ——, 513 F.2d at 428–429.

18. "The United States District Court for the District of Columbia shall have exclusive jurisdiction to hear challenges to the legal or constitutional validity of this title or of any regulation issued under the authority granted by this title, and any action or proceeding involving the question of title, ownership, custody, possession, or control of any tape recording or material referred to in section 101 or involving payment of any just compensation which may be due in connection therewith. Any such challenge shall be treated by the court as a matter requiring immediate consideration and resolution, and such challenge shall have pri-

ority on the docket of such court over other cases." Presidential Recordings and Materials Preservation Act § 105(a), 88 Stat. 1698 (1974).

19. Nixon v. Richey, *supra* note 1, 168 U.S.App. D.C. at ——, 513 F.2d at 429.

20. *Id.* at ——, 513 F.2d at 430.

21. *Id.*

22. "Particularly in view of the issues common to all cases, and as well the obvious bearing of the Act on all cases, if valid, decision of the consolidated cases at this time could compound the difficulties. For if it should later be determined that petitioner's 'challenge' must be heard and decided by a court of three judges, that court will be confronted by decisions of a single judge on some of the issues the three judges are summoned to consider." *Id.*

23. *Id.*

24. *Id.*

25. *Id.*

26. *Id.*

27. *Id.*

we adhered to a tradition inspired by a time-proven expectation that judges will perform their duties, once defined, without coercion by judicial process.[28] Correspondingly, our order accompanying the opinion denied a writ of mandamus "for the reasons and on the conditions stated in the" opinion.

We would be less than frank if we failed to observe that we did not anticipate the events which were soon to follow. Our opinion and order issued at approximately 9:45 a. m. on January 31. In line with our custom in expedited cases, our clerk's office telephonically notified Judge Richey at once, and minutes later copies of the opinion and order were hand-delivered to his chambers. At mid-afternoon of the same day, petitioner's motion for reconsideration of our denial of the writ of mandamus officially informed us that an opinion by Judge Richey in the consolidated cases[29] had been released at 11:00 a. m. The only explanation furnished us is that he had filed the opinion with his courtroom clerk shortly after 2:00 a. m. on that day.[30]

Judge Richey's opinion, a copy of which we later requested, stated that an order of even date would issue.[31] We acted to preserve the status quo by staying temporarily the effectiveness of any order that might have issued, and the entry of any orders in the consolidated cases. We also scheduled a special hearing on the day following, February 1, to

better enable a determination as to whether the stay should be left in effect. At the hearing, we entertained argument not only for the parties to the challenge case, but also on behalf of others, as amici curiae, who are parties to the consolidated cases. We learned at the hearing that no order on Judge Richey's opinion had been entered.

Subsequent to the hearing, on February 4, Judge Richey transmitted to us a report informing that on that date he had requested the Chief Judge of this circuit to convene a three-judge court to determine initially whether the challenge case should be heard and decided by such a court.[32] On the next day, the Chief Judge designated two judges to serve with Judge Richey as the court.[33] Thus the need for any further action on our part to activate the three-judge court machinery has disappeared. There remains, however, the question, extensively debated by the litigants, as to whether the stay should be continued; this question is explicitly presented by motions of some of the parties to vacate our stay.

## II

■ Manifestly, Judge Richey was obligated to abide any decision we might render on the petition for mandamus. "[A] lower court is bound to respect the mandate of an appellate tribunal;"[34] it "is without power to do anything which is contrary to either the letter or spirit

---

**28.** *E. g.,* Fine v. McGuire, 139 U.S.App.D.C. 341, 344, 433 F.2d 499, 502 (1970); Reed Enterprises v. Corcoran, 122 U.S.App.D.C. 387, 392, 354 F.2d 519, 524 (1965); Svejkovsky v. Tamm, 117 U.S.App.D.C. 114, 115, 326 F.2d 657, 658 (1963).

**29.** Nixon v. Sampson, 389 F.Supp. 107 (D.D.C. 1975).

**30.** The events just recited are discussed more fully in Part II, *infra.* The source of our information is two-fold. At 4:31 p. m. on February 12, Judge Richey filed in this court an unsolicited memorandum setting forth "the circumstances surrounding entry of [his] opinion in the consolidated cases . . . ." That memorandum appears as Appendix A to this opinion. We also incorporate, as Appendix B, a

memorandum prepared by our First Deputy Clerk on January 31, listing, with time notations, relevant events through that date, from which we have deleted references to decisional action by this court not material to the problem involved in this case.

**31.** Nixon v. Sampson, *supra* note 29, 389 F.Supp. at 160.

**32.** See 28 U.S.C. § 2284(1) (1970).

**33.** See *id.*

**34.** FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 140, 60 S.Ct. 437, 440, 84 L.Ed. 656, 660 (1940). *See also* Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 168, 59 S.Ct. 777, 780–781, 83 L.Ed. 1184, 1188 (1939); Durant v. Essex Co., 101 U.S. 555, 556–557, 25 L.Ed. 961, 962 (1879).

of the mandate construed in the light of the opinion of [the] court deciding the case."[35] That we did not issue a writ of mandamus is beside the point. Our opinion set forth our views, the courses we held indicated, and why we deemed a writ unnecessary. Our order stated explicitly that the writ was denied "for the reasons and on the conditions stated in the" opinion.[36] The opinion as well as the order comprised our mandate,[37] and the opinion was to be consulted to ascertain what was required of Judge Richey.[38]

We cannot accept Judge Richey's explanation of his action[39] as ground for deviation from these well-settled principles. Disavowing the notion that he acted hastily to circumvent an adverse directive from this court,[40] he says in essence that having twice previously stated that he would complete the opinion by January 31,[41] he felt it imperative to do so.[42] That, he tells us, was why work on the opinion continued beyond 2:00 a. m. on that morning, and why the opinion was signed and filed in the District Court's clerk's office at that early hour for reproduction.[43] He adds that the opinion was publicly released at 11:00 a. m., notwithstanding knowledge of our opinion and order, because he "had *already acted* in the consolidated cases as promised."[44]

We note a significant variation between Judge Richey's statement and our First Deputy Clerk's careful record of the relevant facts, logged to the minute.[45] That variation is an omission in Judge Richey's version. While he states that he received our order in his chambers "[s]ome time after 10:00 a. m."[46] he neglects to mention that at precisely 9:50 a. m. he was telephonically advised that our order and opinion had been entered by the First Deputy Clerk, who read the order to him twice, emphasizing that a writ of mandamus had been denied only "for the reasons and on the conditions stated in [the] attached" opinion.[47] The order and opinion were hand-delivered to Judge Richey's chambers between 9:45 a. m. and 9:55 a. m.,[48] and we see from Judge Richey's own statement that calls advising counsel of his ruling were not made until after 10:00 a. m.[49]

We note also the absence of any positive suggestion that Judge Richey's opinion had been entered on the civil docket when our opinion and order were received.[50] When his courtroom clerk was asked at what time the opinion was filed, she said "11:00 a. m."[51] It was two hours afterwards that she called our First Deputy Clerk to say that the opinion had been "filed" in the wee hours of the morning although not released until 11:00 a. m.[52] But irrespective of docketing, we deem the predawn "filing" of Judge Richey's opinion to be of no conceivable legal or practical effect. It is perfectly clear from his own statement that he had control of the opinion at 11:00 a. m., and that counsel were not notified of it until after Judge Richey had been verbally informed of our opin-

---

35. Yablonski v. UMW, 147 U.S.App.D.C. 193, 195, 454 F.2d 1036, 1038 (1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1609, 31 L.Ed.2d 816 (1972), quoting Thornton v. Carter, 109 F.2d 316, 320 (8th Cir. 1940).

36. See text *supra* at notes 25–28.

37. See Fed.R.App.P. 41(a).

38. *See* Gulf Ref. Co. v. United States, 269 U.S. 125, 135, 46 S.Ct. 52, 53, 70 L.Ed. 195, 198 (1925); FTC v. Standard Educ. Soc'y, 148 F.2d 931, 932 (2d Cir. 1945); Ohio Oil Co. v. Thompson, 120 F.2d 831, 836 (8th Cir.), cert. denied, 314 U.S. 658, 62 S.Ct. 112, 86 L.Ed.2d 528 (1941).

39. App. A.

40. App. A at 449, 450, 451.

41. In his letter to counsel, see text *supra* at note 13, and in his response to the petition for mandamus. App. A at 449–450.

42. App. A at 450.

43. App. A at 450.

44. App. A at 451 (emphasis in original).

45. App. B.

46. App. A at 451. But see App. B at 454–455.

47. App. B at 454.

48. App. B at 454–455.

49. App. A at 451.

50. Fed.R.Civ.P. 79(a).

51. App. B at 455.

52. App. B at 455.

ion and order and had a copy of both in his hands.[53] It was his plain duty to abide that decision, and nothing in his statement provides good cause for not so doing.

■ From January 28, when Judge Richey was served with a copy of the petition for mandamus, he knew that petitioner sought from this court a writ commanding, *inter alia,* priority of decision for the challenge case over the consolidated cases. From the fact that, on January 29, we called for responses to the petition on the very next day, he knew that we would not deny the petition out of hand,[54] and that we were proceeding speedily toward action on it. We think it clear that a judge is under a duty not to so circumstance himself as to be unable to conform to directives of a higher court which, from plain appearances, might be imminent. Irrespective of motivation, the course Judge Richey followed after learning of the mandamus proceeding[55] seems to have totally ignored that possibility.

■ Even more fundamentally, priority in the filing-time as between Judge Richey's opinion and our order is unimportant to our decision, for in either event we have the responsibility of protecting affected litigants from possible harm. To insure justice for the litigants is invariably our overriding concern. The difficulty germinated by Judge Richey's action must now be brought under control and that may be undertaken within the framework of the present proceeding. "[M]andamus lies to rectify a deviation"[56] or "to correct a miscon-

ception of the scope and effect of the appellate decision."[57] To that task we now proceed, first defining the problem in terms of relevant statutory provisions.

■ Congress has ordained that an action seeking an injunction against the enforcement of its legislation on grounds of federal unconstitutionality be heard and determined by a district court comprised of three judges.[58] Congress has also specified that "[o]n the filing of the application" for injunction, the district judge to whom it is presented "shall immediately notify the chief judge of the circuit"[59] and, further, that an application for a preliminary injunction in such an action—as petitioner sought here— "shall be given precedence and assigned for a hearing at the earliest practicable day."[60] We have previously held that in instances where a three-judge court is in order, the single judge must activate the three-judge machinery, and that any stay of three-judge proceedings which is proper may be granted only by the three judges.[61]

In our earlier opinion, we expressly refrained, as we do now, from deciding whether these particular provisions apply to the challenge case.[62] But in addition to these provisions, there is Section 105(a) of the Presidential Recordings and Materials Preservation Act,[63] which has evident bearing. As we stated in our earlier opinion,

> Section 105(a) of the Act confers upon the District Court for the District of Columbia "exclusive jurisdiction to hear challenges to the legal or constitutional validity of this title,"[64] and

**53.** App. A at 451. See also App. B. at 455.

**54.** See Fed.R.App.P. 21(b).

**55.** See text *supra* at notes 42–49.

**56.** Yablonski v. UMW, *supra* note 35, 147 U.S. App.D.C. at 195, 454 F.2d at 1038. *See also* Will v. United States, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305, 310 (1967); De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 217, 65 S.Ct. 1130, 1133, 89 L.Ed. 1566, 1572 (1945).

**57.** Yablonski v. UMW, *supra* note 35, 147 U.S. App.D.C. at 195, 454 F.2d at 1038, *See also* United States v. Haley, 371 U.S. 18, 19, 83 S.Ct.

11, 9 L.Ed.2d 1, 2 (1962); In re Sanford Fork & Tool Co., 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414, 416 (1895).

**58.** 28 U.S.C. § 2282 (1970).

**59.** 28 U.S.C. § 2284(1) (1970).

**60.** 28 U.S.C. § 2284(4) (1970).

**61.** Svejkovsky v. Tamm, *supra* note 28, 117 U.S.App.D.C. at 115, 326 F.2d at 658.

**62.** Nixon v. Richey, *supra* note 1, 168 U.S.App. D.C. ——, 513 F.2d at 430.

**63.** See note 18, *supra.*

**64.** See note 18, *supra.*

specifically provides that "[a]ny such challenge shall be treated by the court as a matter requiring *immediate* consideration and resolution . . . ."[65] . . . It is clear that the case for which petitioner sought the three-judge court was a "challenge to the legal or constitutional validity of" the Act. It is equally clear that, as an integral part of his "challenge," petitioner's application for such a court was "a matter requiring immediate consideration and resolution . . ."[66]

And we further stated:

Section 105(a) of the Act distinguishes the treatment to be given "challenges to the legal or constitutional validity of this title,"[67] on the one hand, and "any action or proceeding involving the question of title, ownership, custody, possession, or control of any tape recording or material referred to in [the Act] or involving payment of any just compensation which may be due in connection therewith."[68] The section then specifies, not only that "[a]ny such challenge shall be treated by the court as a matter requiring immediate consideration and resolution,"[69] . . . but also that "such challenge shall have priority on the docket of such court over other

cases."[70] We have said that the case wherein petitioner seeks a three-judge court was a "challenge" within the contemplation of Section 105(a). We now add that as such it was entitled to priority over the consolidated cases— "other cases" because plainly "action[s] . . . involving the question of title, ownership, custody, possession, or control of" materials embraced within the Act.[71]

 In that opinion, we also took pains to alert Judge Richey to the peril of disposing of the consolidated cases ahead of the challenge case,[72] and to identify the nature of the peril.[73] Our reference obviously was to the doctrine of collateral estoppel,[74] which might bar petitioner from urging in the challenge case positions contrary to determinations which any decision of the consolidated cases might yield.[75] We reiterate that petitioner and his adversary in the challenge case were also parties to the consolidated cases, and that the issues of ownership and privilege in regard to the presidential materials were common to each. Adjudication of those issues in the consolidated cases, then, might foreclose antagonistic theories of ownership and privilege as bases for contentions in the challenge case.

65. See note 18, *supra.*

66. Nixon v. Richey, *supra* note 1, 168 U.S.App. D.C. at ——, 513 F.2d at 429.

67. See note 18, *supra.*

68. See note 18, *supra.*

69. See note 18, *supra.*

70. See note 18, *supra.*

71. Nixon v. Richey, *supra* note 1, 168 U.S.App. D.C. at ——, 513 F.2d at 429–430.

72. See text *supra* at notes 22–24.

73. See note 22, *supra.*

74. See generally 1B J. Moore, Federal Practice ¶¶ 0.441 et seq. (1974).

75. Under the doctrine of collateral estoppel, a final judgment in a prior suit precludes relitigation of material issues decided therein. Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122, 1127 (1955); Partmar Corp. v. Paramount Pictures Theatres Corp., 347 U.S. 89, 91, 74 S.Ct.

414, 416, 98 L.Ed. 532, 537 (1954); Southern Pac. R. R. v. United States, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355, 377 (1897). The federal rule is that pendency of an appeal does not suspend the operation of a final judgment for purposes of collateral estoppel, except where appellate review constitutes a trial de novo. Huron Holding Corp. v. Lincoln Mine Operating Co., 312 U.S. 183, 188–189, 61 S.Ct. 513, 515, 85 L.Ed. 725, 729 (1941); Reed v. Allen, 286 U.S. 191, 199, 52 S.Ct. 532, 533, 76 L.Ed. 1054, 1057 (1932); 1B J. Moore, Federal Practice ¶ 0.416[3], at 2252 (1974). The majority of the states follow the same rule. *See* Denham v. Shellman Grain Elevator, Inc., 444 F.2d 1376, 1380 (5th Cir. 1971); Overseas Motors, Inc. v. Import Motors, Ltd., 375 F.Supp. 499, 517 (E.D.Mich.1974); J. Moore, *supra,* at 2254. The prior judgment will support a claim of collateral estoppel even where it has been stayed pending appeal. Huron Holding Corp. v. Lincoln Mine Operating Co., *supra,* 312 U.S. at 189, 61 S.Ct. at 515, 85 L.Ed. at 729; J. Moore, *supra,* at 2252–53.

What we feared came to pass. Judge Richey's decision in the consolidated cases rejects petitioner's premises on ownership and privilege.[76] If ordered into effect, petitioner says, the decision will prevent him from presenting to the three-judge court substantial arguments in support of his challenge to the constitutional validity of the Act, and for that reason he asks that the stay be continued. So it is that, on the stay matter, the question of priority as between the challenge case and the consolidated cases comes to the fore.

While, as noted,[77] in our previous opinion we discussed the facial indications of Section 105(a)'s priority provision, we felt that resolution of the priority issue was for the three-judge court,[78] and we now adhere to that view. Because, however, it is strenuously argued that the priority provision does not justify any further stay, we have reexamined the provision in light of its legislative history to ascertain how strong the possibility is

that the priority provision means just what it appears to say.[79] We turn now to the results of that reinvestigation.

### III

The history of the Presidential Recordings and Materials Preservation Act portrays vividly the congressional view that legislation as to the presidential materials was needed importantly and urgently, and, as well, that questions as to the validity of such legislation should be considered and resolved by the courts expeditiously. On September 8, 1974, President Ford announced that petitioner and the Administrator of General Services had negotiated and executed an agreement—the "Nixon-Sampson agreement"—conferring control of the materials upon petitioner.[80] Both Houses of Congress were concerned about the potential consequences of that agreement in terms of continuing availability of and access to the presidential materials.[81]

**76.** Nixon v. Sampson, *supra* note 29, 389 F.Supp. at 133–145, 147–153.

**77.** See text *supra* at note 18.

**78.** Nixon v. Richey, *supra* note 1, 168 U.S.App. D.C. at ——, 513 F.2d 429–430.

**79.** Our function in this regard approximates the function leading to an estimate of the probability of success on the merits when a litigant moves for a stay pending appeal. Here we undertake only to gauge probabilities, leaving the ultimate decision where it properly belongs.

**80.** See S.Rep.No. 93–1181, 93d Cong., 2d Sess. 3–4 (1974); H.R.Rep.No. 93–1507, 93d Cong., 2d Sess. 3 (1974).

**81.** The Senate Committee on Government Operations explained:

The net effect of [the] provisions [of the Nixon-Sampson agreement] is to place the tape recordings in imminent danger of destruction. In the event of Mr. Nixon's death, all the tapes would have to be destroyed. The agreement also requires the Office of Special Watergate Prosecution Force, as well as any other litigant, to file with Mr. Nixon any request for access to the tapes and other materials. This, in turn, raises the strong possibility that the prosecution of the Watergate crimes could be marked by protracted delays in obtaining evidence, since it is quite possible that Mr. Nixon might resist some or perhaps all of that Office's requests

for information. Moreover, the agreement suggests that Mr. Nixon, or his designees, could start destroying all the papers and materials (other than the tapes) by 1977.

The ultimate destruction of the tapes, coupled with the difficulties in obtaining access to the other Nixon materials, would be a fundamental violation of public policy. To begin with, prosecutors, defendants, and the courts probably would be deprived of crucial evidence bearing on the defendants' innocence or guilt of the Watergate crimes for which they stand accused. Moreover, the American people would be denied full access to all facts about the Watergate affair, and the efforts of Congress, the executive branch, and others to take measures to prevent a recurrence of the Watergate affair may be inhibited. The Nixon-Sampson agreement, then, bears not only on our system of justice; it also bears on the viability of our constitutional system of government. S.Rep.No. 93–1181, 93d Cong., 2d Sess. 4 (1974).

The House Committee on House Administration had this to say:

. . . the agreement gives Mr. Nixon total control over all the materials and records of his Administration. It allows him to have access to the materials but excludes others from reviewing these records. By allowing Mr. Nixon to destroy all of the materials, the agreement ignores the public interest in preserving them. It ignores the legiti-

In both Houses bills were promptly introduced, and they had as their purpose alteration of the Nixon-Sampson arrangement to invest the Federal Government with control over the materials, and thereby with power to protect them and provide for access. The Senate bill, introduced on September 18,[82] critical features of which we later discuss,[83] passed that body on October 4[84] and, with minor variations, the House on December 3.[85] Following amendments by the Conference Committee,[86] both Houses, on December 9, enacted the measure into law.[87] Thus Congress achieved the goal of expediting passage of legislation on the matter of the presidential materials.

The second congressional goal—speedy determination of possible challenges to the validity of the Act—was initially approached by insertion of an express provision on that subject in the Senate bill. In the form in which it first passed both Houses, the bill specifically provided that:

> The Federal District Court for the District of Columbia shall have exclusive jurisdiction to hear challenges to the legal or constitutional validity of any provision of this Act or of any regulation issued under the authority granted by this Act. Such challenge shall be heard by a three-judge court constituted under the procedures delineated in section 2284, title 28 of the United States Code, with the right of

direct appeal to the United States Supreme Court. Any such challenge shall be treated by the three-judge court and the Supreme Court as a priority matter requiring immediate consideration and resolution.[88]

When the Senate first considered the measure, Senator Ervin, one of its sponsors, commented that

> [t]his legislation, of course, may be subject to legal or constitutional challenges. In light of this possibility, the final principal provision states that all such challenges shall be heard on an expedited basis by a three-judge court, with direct appeal to the Supreme Court. In this way, all legal and constitutional issues can be resolved quickly.[89]

Senator Javits, another sponsor, stated that the bill

> vests in the U.S. District Court for the District of Columbia exclusive jurisdiction to hear challenges to the legal or constitutional validity of any provision of this act. It provides further that such challenges shall be heard by a three-judge court, with the right of appeal to the U.S. Supreme Court, and requires that such challenges be treated by both courts as priority matters to be given immediate consideration and resolution.[90]

And Senator Nelson, still another sponsor, pointed out that

---

mate continuing need for these materials in many judicial proceedings, including some in which U. S. law enforcement will be frustrated and individual rights impaired if the materials are unavailable to the courts. It ignores the needs of Congress and executive agencies for continued use of the documents in the process of government. And it ignores the needs of historians, political scientists, and other scholars for the information these materials contain on the events of recent years and the workings of our government.
H.R.Rep.No. 93–1507, 93d Cong., 2d Sess. 3 (1974).

82. 120 Cong.Rec. S 16870 (daily ed. Sept. 18, 1974).

83. See text *infra* at notes 88–92.

84. 120 Cong.Rec. S 18336 (daily ed. Oct. 4, 1974).

85. 120 Cong.Rec. H 11212 (daily ed. Dec. 3, 1974).

86. 120 Cong.Rec. H 11442 (daily ed. Dec. 9, 1974).

87. 120 Cong.Rec. S 20809, H 11445 (daily ed. Dec. 9, 1974).

88. 120 Cong.Rec. S 18234 (daily ed. Oct. 3, 1974).

89. 120 Cong.Rec. S 18236 (daily ed. Oct. 3, 1974).

90. 120 Cong.Rec. S 18239 (daily ed. Oct. 3, 1974).

[t]his bill provides an expedited procedure to test any question of the invasion of anybody's rights. . . . It requires a three-judge circuit [*sic*] court to have the matter treated as a priority issue, and then appeal to the Supreme Court.[91]

Similarly, in the House, Representative Brademas, the floor manager of the bill in that body, explained to his colleagues that

[t]o insure expeditious resolution of any challenge to the legal or constitutional validity of any provision of this title, the bill provides that any such challenge shall be heard by a three-judge panel of the U.S. District Court for the District of Columbia with a direct appeal to the U.S. Supreme Court. The bill further provides that any challenge and appeal shall be heard as a priority matter.[92]

Another manifestation of how urgent Congress deemed the enactment of legislation to deal with the presidential papers is found in the statutory scheme itself. Throughout the reports and debates on the bills which eventuated into the Act, Congress repeatedly made it plain that it considered the question of ownership of the materials to be a subject for judicial decision rather than legislation.[93] It believed, however, that the situation demanded legislation *immediately,* without awaiting judicial determination of the question of ownership,[94] and further believed that legislation could appropriately be framed to meet the emergency the Nixon-Sampson

agreement portended, without a resolution of that question, simply by making provision for the payment of just compensation for such materials as the courts might later determine was due.[95] As the report of the Committee on Government Operations elucidates:

If the materials are public property, the Congress is merely exercising its powers under Article IV of the Constitution to dispose of public property.

If the materials are private property, then the Congress is merely taking "protective custody" of them for critically important public business

. . . .

If a court should decide that the legislation would in any way deprive Mr. Nixon, or anyone else, of private property, provision is then made to have him paid just compensation for the loss of any such property right. The payment of such just compensation will render any "taking" under the legislation as constitutional.[96]

So it was that the Act, with relatively minor differences in text, passed both Houses of Congress.[97] It was only thereafter, but at some time prior to action by the Conference Committee on the differences between the Senate and House versions, that the pendency of the consolidated cases before Judge Richey assumed a role. In conference, the three-judge court requirement was eliminated, and the measure, with Section 105(a), in its present form,[98] was approved by the Committee[99] and subsequently accepted by both houses.[100] The only explanation for this action is found in remarks by

91. 120 Cong.Rec. S 18327 (daily ed. Oct. 4, 1974).

92. 120 Cong.Rec. H 11208 (daily ed. Dec. 3, 1974).

93. See S.Rep.No. 93–1181, 93d Cong., 2d Sess. 3–5 (1974); H.R.Rep.No. 93–1507, 93d Cong., 2d Sess. 4–5 (1974).

94. See S.Rep.No. 93–1181, 93d Cong., 2d Sess. 4–5 (1974); H.R.Rep.No. 93–1507, 93d Cong., 2d Sess. 5 (1974).

95. S.Rep.No. 93–1181, 93d Cong., 2d Sess. 3–4 (1974); H.R.Rep.No. 93–1507, 93d Cong., 2d Sess. 5 (1974).

96. S.Rep.No. 93–1181, 93d Cong., 2d Sess. 5–6 (1974). See also, to the same effect, H.R.No. 93–1507, 93d Cong., 2d Sess. 7 (1974).

97. 120 Cong.Rec. S 18336 (daily ed. Oct. 4, 1974); 120 Cong.Rec. H 11212 (daily ed. Dec. 3, 1974).

98. See note 18, *supra.*

99. See 120 Cong.Rec. H 11443 (daily ed. Dec. 9, 1974).

100. See 120 Cong.Rec. S 20809, H 11445 (daily ed. Dec. 9, 1974).

Representative Brademas when the action of the Conference Committee came on for consideration by the House. Representative Brademas explained:

These amendments combine two sections in the House-passed measure—sections 103 and 106—to make clear that the U.S. District Court for the District of Columbia shall have exclusive jurisdiction to, hear all challenges to this legislation, including challenges to the legal and constitutional validity of this title and any challenge regarding the question of title, custody, possession or control of these tapes and materials and the payment of "just compensation" which may be required. The amendment also deletes the provision for a three-judge court with direct appeal to the Supreme Court. This amendment would thereby enable a single judge of the U.S. District Court for the District of Columbia to hear any challenge to this legislation. The amendment provides that any challenges to this legislation receive priority consideration and that all appeals be heard on an expedited basis.

This amendment would allow for an expeditious review of any legal challenge to this legislation. There is now pending before a single-judge District Court for the District of Columbia a proceeding in which the major issues have already been briefed and argued and in which the major parties are present. Under the amendment, the pleadings in the pending litigation could be amended to take into account additional issues regarding the validity of the legislation and the United States could be added as a defendant to any claim for compensation by Mr. Nixon.

. . . The new "judicial review" section, section 105, would provide that any challenge to this legislation could be considered as part of litigation which is now pending in the U.S. Dis-

trict Court for the District of Columbia. Since most of the issues in this litigation have been fully briefed and competently argued, and since the issues in any challenge to this litigation will be essentially the same, the public interest will be fully represented. And, if it becomes apparent that a particular point may not be adequately represented, the judge presiding over such litigation could appoint an amicus curiae to argue these points.[101]

The remarks of Representative Brademas demonstrate that Congress intended to preserve single-judge jurisdiction over the consolidated cases, even for consideration and decision of challenges to the constitutional validity of the new Act in the event that such challenges were asserted in those cases. The remarks plainly contemplated, too, that any such challenge would utilize that opportunity. But Representative Brademas was completely silent on the question whether such a challenge could only take that route, and so is the rest of the legislative history.

We need not ponder whether Congress could validly have imposed the requirement that such a challenge could only be entertained in the consolidated cases. Nowhere in the legislative history is there any suggestion that Sections 2282 and 2284 would not enable a separate suit presenting a constitutional challenge to the Act in the context of a demand for injunctive relief. It would have been simple for Representative Brademas to state, and indeed for Congress to require, that those sections would not apply to challenges to the Act, had that been what Congress had in mind. Neither, however, was done, and the courts are left with the problem of determining whether petitioner's separate-suit challenge requires the usual three-judge court, particularly in light of the general canon of construction that repeal of a statute by implication is disfavored.[102]

101. 120 Cong.Rec. H 11444 (daily ed. Dec. 9, 1974).

102. Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Comm'n, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334, 340 (1968); United States v. Zacks, 375 U.S. 59, 67–68, 84 S.Ct. 178, 183, 11 L.Ed.2d 128, 134 (1963); Silver v. New York

It is much the clearer, however, that Congress deemed indispensable to its objectives the immediate consideration and resolution of any challenge to the constitutional or legal validity of any provision of the new Act. It was to mandate that degree of expedition that each of the bills initially passing the Senate and the House contained the requirement that such challenges be heard and determined by a three-judge court, with direct appeal to the Supreme Court,[103] and contained also the requirement that both courts proceed immediately to consider and resolve the challenges.[104]

It was because, thereafter it came to the attention of Congress that the consolidated cases were pending before Judge Richey and, in the understanding of Congress, had proceeded to the point of briefing of many of the questions related to the validity of the Act, that the Conference Committee decided to leave it possible to utilize that litigation as the vehicle for speedy resolution of challenges to the validity of the Act[105] instead of *requiring* a three-judge court. In sum, because of the progress Congress assumed the consolidated litigation had already made to that point, it was felt that expedition could be promoted if, in lieu of providing for a new suit before a three-judge court—which would have to start from a new beginning—the progress already achieved in the consolidated cases could be capitalized on.

But what Congress expected, and what Section 105(a) as enacted would permit, was that any and all challenges to the validity of the Act would be made in the consolidated cases before Judge Richey as a single judge, after appropriate amendments and additions of parties for that purpose were accomplished.

What Congress apparently did not anticipate was that petitioner, instead of pursuing that route, would institute a new, separate suit grounded on Sections 2282 and 2284 to test in orthodox fashion the constitutionality of the Act before a three-judge rather than a single-judge tribunal.

There is yet another important consideration and it indicates strongly that Congress intended that questions affecting the constitutional validity of the Act should be considered and completely resolved prior to any decision of other issues pertaining to the presidential materials. The Act, on its face, provides a comprehensive scheme for control, preservation and utilization of the presidential materials in the manner found to be best suited to the needs of the Federal Government and the American public. It requires the Administrator of General Services to "receive, obtain, or retain, complete possession and control of all original tape recordings of" designated conversations,[106] and "of all papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical materials of Richard M. Nixon, covering the period beginning January 20, 1969, and ending August 9, 1974."[107] It provides specifically that "[n]one of the tape recordings or other materials . . . shall be destroyed, except as" Congress may later provide;[108] that the materials are immediately available, on a priority basis, to the Special Watergate Prosecution Force for use in judicial proceedings;[109] that petitioner or his designee shall have access to the materials for purposes consistent with the Act, subsequent and subject to regulations the Administrator is required to promulgate;[110] and that agencies and departments in the Execu-

---

Stock Exchange, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389, 400 (1963).

**103.** See 120 Cong.Rec. S 18234 (daily ed. Oct. 3, 1974).

**104.** See 120 Cong.Rec. S 18234 (daily ed. Oct. 3, 1974).

**105.** See text *supra* at note 101.

**106.** Presidential Recordings and Materials Preservation Act, § 101(a), 88 Stat. 1695 (1974).

**107.** *Id.* § 101(b)(1), 88 Stat. 1695 (1974).

**108.** *Id.* § 102(a), 88 Stat. 1696 (1974).

**109.** *Id.* § 102(b), 88 Stat. 1696 (1974).

**110.** *Id.* § 102(c), 88 Stat. 1696 (1974).

tive Branch shall have access to the materials subject to such regulations.[111] The Administrator is required to promulgate a set of regulations "as may be necessary to assure the protection of the" materials "from loss or destruction, and to prevent access to such" materials "by unauthorized persons,"[112] the regulations within ninety days after enactment to be submitted to both Houses of Congress and to become effective ninety legislative days following submission unless disapproved by a resolution adopted by either House during such period.[113] In promulgating the regulations, the Administrator is required to take into account a great variety of factors bearing on the relative needs of government, the public, litigants and petitioner to controlled access to the materials.[114]

It is thus seen that Congress fashioned the Act to cover a wide territory. Once the Administrator has fashioned regulations which do not incur congressional disapproval the interests of all will be carefully and comprehensively regulated.[115] It must be noted, too, that the regulatory process is to continue indefinitely into the future, with revisions of regulations from time to time as may be needed.[116] If only the Act and the implementing regulations are valid, Congress will have settled questions about the materials on a very broad scale.

It may well be wondered how much, if anything, will be left unregulated by the Act and the regulations; in other words, what else, if anything, a court will have to pass upon, aside from disputes over access to the materials *under* the legisla-

tively- and administratively-established criteria, and questions of just compensation for takings essential to enable governmental retention and control.[117] In any event, to the extent that Congress and the Administrator of General Services validly define the rights and interests of those to whom the materials are subjects of concern, judicial decisions on those subjects might well be unnecessary and meaningless. All this would seem to suggest that what Congress contemplated, and what congressional specifications in Section 105 mean, is that questions of validity of the Act's provisions would be decided ahead of other questions.

This review of the Act's legislative history, we think, lends clarity to the priority features of Section 105(a). The essence of the legislative lesson may be briefly summarized. Section 105(a) sharply distinguishes between "challenges to the . . . constitutional validity of" Title I of the Act,[118] like petitioner's constitutional attack, and actions involving questions "of title, ownership, custody, possession, or control of" the presidential materials, like the consolidated cases.[119] Section 105(a) then proceeds to specify that "[a]ny such challenge shall be treated by the court as a matter requiring immediate consideration and resolution"[120] and that "such challenge shall have priority on the docket of such court over other cases."[121] As the text and legislative history, read together, make quite plain, what Congress wanted was speed in judicial handling of such "challenges," whether properly to be considered and determined by three judges or one.[122] Just as plainly, the

---

111. *Id.* § 102(d), 88 Stat. 1696 (1974).

112. *Id.* § 103, 88 Stat. 1696 (1974).

113. *Id.* § 104(a), (b)(1), 88 Stat. 1696, 1697 (1974).

114. *Id.* § 104(a)(1)–(7), 88 Stat. 1696–97 (1974).

115. The Act expressly leaves unaffected rights, limitations and exemptions applicable under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.* (1970). Presidential Recordings and Materials Preservation Act, § 104(d), 88 Stat. 1698 (1974). This means, of course, that

both statutes, together with the regulations, would supply the governing rule for all cases.

116. See Presidential Recordings and Materials Preservation Act, § 104(b)(3), 88 Stat. 1697 (1974).

117. See note 115, *supra.*

118. See note 18, *supra.*

119. See note 18, *supra.*

120. See note 18, *supra.*

121. See note 18, *supra.*

122. See text *supra* this part.

text and history of Section 105(a) indicate that Congress did not share the same concern for speed in the resolution of litigation not amounting to a "challenge." That litigation is relegated to a position below the priority specified for "challenge" actions.

## IV

Events subsequent to issuance of our stay order have mitigated somewhat the problem left in the wake of Judge Richey's released opinion in the consolidated cases. His call for a three-judge court and the designation of that court for petitioner's challenge case[123] have eliminated any pre-existing need for a stay pending consideration of those aspects of the litigation. There remains, however, the unsettled question of priority as between the challenge case and the consolidated cases. That is a matter retaining importance from the possible impact, upon presentation and treatment of constitutional contentions in the challenge case, of Judge Richey's determinations on ownership and privilege, in ref-

erence to the presidential materials, should they be ordered into operation.[124]

■■ As we have stated, those determinations, once effective, may preclude petitioner from advocating in the challenge case any constitutional position hypothesizing ownership or privilege differently from Judge Richey's outcome on those scores.[125] By the same token, the three-judge court, convened to render a decision on the Act's constitutionality, might find itself unable to view the Act in light of conclusions on ownership and privilege variant from Judge Richey's, and conceivably unable to pass on the Act at all. We are mindful that the need for a three-judge court in the challenge case is still uncertain.[126] But it is clear enough that if that court is found to be jurisdictionally required, it must be indulged enough room to enable proper performance of the serious and difficult task of sound constitutional adjudication.[127] Three-judge business is for three judges, not just one,[128] and we cannot accept the notion that a single judge can unilaterally narrow the ambit of a three-judge tribunal.[129] We think,

123. See text *supra* at notes 32–33.

124. See Part II, *supra*. The priority question and the three-judge question are independent, and the question of priority remains whether a decision thereon is to be made by one judge or three. See text *supra* at notes 63–71.

125. See text *supra* at notes 73–76.

126. See text *supra* at notes 58–66.

127. This is well illustrated by numerous holdings that, notwithstanding the factual conclusions of state courts, the Supreme Court on review has the duty of independently examining the facts and determining whether federal rights at stake have been violated. *See, e. g.,* Greenbelt Cooperative Pub. Ass'n v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6, 13 (1970); Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599, 603 (1967); Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 121, 74 S.Ct. 403, 410, 98 L.Ed. 546, 556 (1954); Niemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267, 270 (1951).

128. Compare Svejkovsky v. Tamm, *supra* note 28, where we found error in the action of the district judge who, instead of promptly deciding whether to call for convocation of a three-

judge court, stayed proceedings in the case pending decision by the Supreme Court of another case involving the same or similar issues. We said that "[i]f such a stay is deemed proper here, under § 2284 it should, in any event, be granted by the court of three judges, and not by the single judge who is required to initiate the three-judge proceedings." 117 U.S. App.D.C. at 115, 326 F.2d at 658.

129. It is argued that Judge Richey, as a single judge, could properly decide whether resolution of the consolidated cases should be deferred pending the outcome of the challenge case. The cases relied upon do not support that proposition. In Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), the Court upheld the authority of a single judge to pass on a question of conflict between the state law under challenge and federal law before requesting a three-judge court. In Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974), the Court noted that a single judge could dismiss a constitutional challenge for lack of standing without asking for a three-judge court, despite the fact that such a court would otherwise be required. 419 U.S. at 99, 95 S.Ct. at 295, 42 L.Ed.2d at 258. *See also* Rosado v. Wyman, 397 U.S. 397, 90

rather, that it is for the three-judge court to define its area of proper concern in the challenge case, and to ascertain for itself whether Judge Richey's action amounted to a preemption of its prerogatives, particularly under the priority specification of the Act.[130]

Had the three-judge court been convened promptly after the filing of the challenge case, it could have avoided the dilemma now confronting it. It could have adjudicated the priority question and, if its ruling favored priority for the challenge action, it could have enjoined the parties to the consolidated cases from proceeding further toward a decision on the merits.[131] But with the consolidated cases decided and lacking only an implementing order when the three-judge court came into being, there appears to be no method whereby that court might now implement any conclusion it might reach that the challenge case has priority.[132] Rather, the choice, as we see it, is between a stay of any order effectuating Judge Richey's decision in the consolidated cases until the three-judge court can decide the priority question and proceed accordingly, on the one hand, and relegating that question to an appeal from Judge Richey's decision, to be made possible by dissolution of the stay and entry of an order on the opinion.[133] The choice is thus thrust upon us, and the question is which of the two courses open to us is best calculated to serve the interests of the litigants and the litigations. We settle upon the stay route in lieu of the appeal route.

■ The route by an appeal in the consolidated cases—with adjudication of the priority issues before examination of the merits, to speed resolution—has some attractions. We do not lightly stay judicial decisions which may in the long run turn out to be correct. Our stay will retard, for a while, the progress of an appeal from the decision in the consolidated cases. Additionally, the three-judge apparatus is not to be utilized freely, but only and strictly as Congress has prescribed.[134] These considerations have been carefully weighed as we have

S.Ct. 1207, 25 L.Ed.2d 442 (1972). In these cases, the single judge did no more than the three-judge court would itself have been required to do—dispose of the litigation on nonconstitutional grounds, if possible. In each, the ground for decision was "a ground upon which a single judge could have declined to convene a three-judge court, or upon which the three-judge court could have dissolved itself, leaving final disposition of the complaint to a single judge." Gonzalez v. Automatic Employees Credit Union, *supra*, 95 S.Ct. at 295 (footnote omitted). Here, decision of the consolidated cases hardly had the capability of obviating the need for a three-judge decision on petitioner's challenge to the constitutionality of the Act. Moreover, while single-judge rulings on issues that might obviate the need for a three-judge court obviously promotes conservation of judicial resources, in the instant case Judge Richey apparently entertained no such purpose. If any resolution of the consolidated cases could conceivably have removed the necessity for convening a three-judge court, it was the resolution that Judge Richey fashioned in his opinion of January 31. Nevertheless, on February 5, Judge Richey requested the Chief Judge of the circuit to convene a three-judge court to determine whether a three-judge court was required to hear the challenge to the Act. See text *supra* at note 13.

**130.** See note 18, *supra,* and Part II, *supra.*

**131.** Speed Prods. Co. v. Tinnerman Prods., Inc., 83 U.S.App.D.C. 243, 245–246, 171 F.2d 727, 729–730, (1948); Small v. Wageman, 291 F.2d 734, 735 (1st Cir. 1961); Cresta Blanca Wine Co. v. Eastern Wine Corp., 143 F.2d 1012, 1014 (2d Cir. 1944). Restraint of the parties is not tantamount to restraint of the court. Steelman v. All Continent Corp., 301 U.S. 278, 290–291, 57 S.Ct. 705, 710, 81 L.Ed. 1085, 1093 (1937).

**132.** See text *supra* at notes 73–76.

**133.** The most desirable alternative would be referral of the stay question to the three-judge court. Since, however, an order acting only on the parties, see note 131, *supra,* could not delay an order on Judge Richey's opinion, and consequently could not prevent any collateral effect of the ownership-privilege determinations, it appears that the three-judge court no longer possesses the means of safeguarding the decisional realm to which it may be entitled.

**134.** *E. g.,* Mitchell v. Donovan, 398 U.S. 427, 431, 90 S.Ct. 1763, 1765, 26 L.Ed.2d 378, 382 (1970); Goldstein v. Cox, 396 U.S. 471, 478, 90 S.Ct. 671, 675, 24 L.Ed.2d 663, 669 (1970).

deliberated on the two alternatives open to us.

In support of continuation of the stay, petitioner has suggested that its dissolution would greatly diminish his chances of reversing determinations adverse to his assertions of ownership of the presidential materials and privilege to shield them from outside scrutiny. Should the stay be lifted, petitioner's avenue for review of Judge Richey's conclusions on those issues would, of course, be the normal appeal of right to this court and, if necessary, an application to the Supreme Court for a writ of certiorari, the granting of which is discretionary. The suggestion is that with the stay viable and the three-judge court thus free to decide the ownership and privilege claims for itself, petitioner could appeal, as a matter of right, directly to the Supreme Court if the three-judge court rejected them.[135] We note, however, that petitioner could gain this supposed benefit only if the three-judge court denies a preliminary injunction, or by final order a permanent injunction, against enforcement of the Act;[136] should the court decide that the challenge action is not one requiring three judges,[137] or should it decide that the Act is unconstitutional but an injunction is unnecessary,[138] appellate review must begin in this court.

And if, on a point short of federal constitutionality, injunctive relief should be refused, it is debatable whether a direct appeal to the Supreme Court would offer any advantage over the appellate path through this court.[139] Moreover, even aside from these possibilities, which we are in no position to gauge, there is the question whether in any event the supposed benefit for which petitioner strives is sufficient reason to warrant continuation of the stay.

We need not ponder further this suggestion or the factors favoring the appeal route over the stay route, for another factor dictates our conclusion. The stark truth of the matter is that either method could retard one of the two litigations—the consolidated cases surely by a stay, or the challenge case perhaps by collateral estoppel—and in this milieu we find guidance in what Congress has said and done. We have adverted to the provisions explicitly requiring "immediate consideration and resolution" of any challenge to Title I of the Act,[140] and "priority [of such challenge] on the docket of the [District] [C]ourt over other cases."[141] We have meticulously explored the Act's legislative history,[142] and there have seen the consummated effort to speedily enact this legislation,[143] and the congressional intent that challenges

---

**135.** Pursuant to 28 U.S.C. § 1253 (1970), it is assumed.

**136.** *See* Rockefeller v. Catholic Medical Center, 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970); Goldstein v. Cox, *supra* note 134, 396 U.S. at 475, 90 S.Ct. at 674, 24 L.Ed.2d at 667–668; 9 J. Moore, Federal Practice ¶ 110.-03[3], at 79–80 (1973).

**137.** Mengelkoch v. Industrial Welfare Comm'n, 393 U.S. 83, 89 S.Ct. 60, 21 L.Ed.2d 215 (1968); Wilson v. Port Lavaca, 391 U.S. 352, 88 S.Ct. 1502, 20 L.Ed.2d 636 (1968); 9 J. Moore, Federal Practice ¶ 110.03[3], at 76–77 (1973).

**138.** *See* Mitchell v. Donovan, *supra* note 134, 398 U.S. at 430–431, 90 S.Ct. at 1765, 26 L.Ed.2d at 381–382; Rockefeller v. Catholic Medical Center, *supra* note 136; 9 J. Moore, Federal Practice ¶ 110.03[3], at 77–80 (1973).

**139.** In Gonzalez v. Automatic Employees Credit Union, *supra* note 129, the Court observed that "[w]hile issues short of the merits—such as justiciability, subject-matter jurisdiction, equitable jurisdiction, and abstention—are often

of more than trivial consequence, that alone does not argue for our reviewing them on direct appeal," 419 U.S. at 99, 95 S.Ct. at 295, 42 L.Ed.2d at 258, and that "the courts of appeals might in many instances give more detailed consideration to these issues than this Court, which disposes of most mandatory appeals in summary fashion." *Id.* The Court added that it "typically disposes summarily of between ⅔ and ¾ of the three-judge court appeals filed each term," 419 U.S. at 99 n.17, 95 S.Ct. at 295 n.17, 42 L.Ed.2d at 258 n.17, and that "[i]t seems more than probable that many of these cases, while unworthy of plenary consideration here, would benefit from the normal appellate review available to single-judge cases in the courts of appeals." *Id.*

**140.** See text *supra* at notes 63–66.

**141.** See text *supra* at notes 67–71.

**142.** See Part III, *supra*.

**143.** See text *supra* at notes 80–87.

to its validity proceed through the courts with all possible expedition.[144] Utilization of the appeal route, as the means of dealing with Judge Richey's decisions on ownership and privilege in regard to the presidential materials, would delay consideration by the three-judge court of the full panoply of considerations affecting the constitutionality of the Act; it could, in practical effect, halt the work of the three-judge court until completion of appellate review of the consolidated cases in this court, and possibly in the Supreme Court. On the other hand, continuation of the stay would enable the three-judge court to proceed immediately to the priority issue without the limitations which Judge Richey's determinations may impose. In sum, only the stay route can preserve the possibility of "immediate consideration and resolution" of the challenge case on a basis of "priority . . . over other cases," while the appeal route would stand congressional purpose on its head. When this factor is placed on the scale, the balance clearly favors a continued stay.

Our stay is, of course, for the protection of the three-judge court, a protection it seemingly is unable to erect for itself. It is designed to place the parties in approximately the same positions they would have occupied had the three-judge and priority questions been given the early attention they deserved. The stay will remain in effect for as long, but only so long, as the three-judge court may need it. Now constituted, the court presumably will determine whether the challenge case is properly before a court of three judges and, if so, whether adjudication of that case should precede effectuation of Judge Richey's decision by entry of an order in the consolidated cases. Should the three-judge court answer either the three-judge question or the priority question in the negative, the occasion for the stay will end at that point, as it will whenever that court concludes on any other ground that the stay has served its purpose. Otherwise, the stay will endure until the three-judge court has rendered its decision on petitioner's constitutional challenge. Meanwhile, the court has but to make known its wishes in regard to the stay, and we will be prepared to honor them.

The motion for reconsideration of our earlier disposition of the mandamus petition is granted. The motions to vacate our stay are denied.[145] The stay will remain in effect until further direction by this court. An appropriate order will accompany this opinion.

---

144. See Part III, *supra.*

145. In his motion asking this court to vacate our stay, the Special Prosecutor claims that his investigations will be hindered if the stay remains and prolongs the situation as it existed prior to release of Judge Richey's opinion because, he says, he lacks sufficiently broad access to the presidential materials. Petitioner's counsel represents, however, that petitioner "has not refused to provide the Special Prosecutor any specific item, including tape recordings, which the Special Prosecutor has requested." Moreover, while undoubtedly our stay provides narrower access than the Special Prosecutor sought in the consolidated cases, the procedural differences between the arrangement prior to the stay and the scheme outlined in Judge Richey's opinion are less significant. Accordingly, we see no need to vacate our stay on the ground the Special Prosecutor urges. In any event, we would approve, on an interim basis, an interlocutory modification of Judge Richey's restraining order, which he might desire to make, to permit any necessary access satisfactorily demonstrated to him by the Special Prosecutor—as distinguished from an order implementing Judge Richey's opinion or any further determination on the issues of ownership or privilege. In that event, the Special Prosecutor has our leave to apply to us for a further order excepting such a modifying order from the operation of our stay.

APPENDIX A

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 75-1063

RICHARD NIXON, PETITIONER

v.

HON. CHARLES R. RICHEY,
United States District Court
for the District of Columbia, RESPONDENT

## SUPPLEMENTAL MEMORANDUM BY RESPONDENT

Respondent wishes to set the record straight with respect to the circumstances surrounding entry of its opinion in the consolidated cases (C.A. No: 74-1518, C.A. No. 74-1533, C.A. No. 74-1551) which are now the subject of a stay issued by the above court at about 5:00 p.m. on January 31, 1975. The questions asked by the Court of Appeals in this case at the time of oral argument and some of the pleadings herein indicate that some of the facts may have been subject to question by the parties. Respondent emphatically states that it did not act in anticipation of an adverse opinion or directive from the Court of Appeals. Any other conclusion has no basis in fact, and indeed is contradicted by the facts. Respondent herein feels compelled to give the Court of Appeals the benefit of the facts, some of which are solely within this Court's knowledge.

On two occasions prior to January 30, 1975, Respondent stated on the public record that its opinion in the consolidated cases would be completed by January 31, 1975. First, by letter of January 23, the Respondent informed counsel that the opinion would issue during the week of January 27. Second, in Respondent's "Memo-

randum by Respondent" filed in the mandamus suit at about 4:30 p.m. on January 30, this Court stated that the opinion should be released on the following day, January 31, 1975.

Having made these representations to this Court and the parties, Respondent felt that it was *imperative* to meet the deadline of Friday, January 31, 1975. These representations to the Court of Appeals and counsel were the *sole* source of the Respondent's action on Friday morning. In particular, Respondent *did not* act in anticipation of any ruling by the Court of Appeals in the mandamus suit. A Court of Appeals ruling simply did not appear to be imminent on Thursday, January 30, because the responses of parties were not due until 4:30 that afternoon. In fact, Respondent's response was filed on or about that time in the Office of the Clerk of the Court of Appeals.

In view, then, of the Respondent's representation to the Court of Appeals at or about 4:30 p.m. on Thursday, January 30, that Respondent's opinion "should be ready for release on Friday [January 31]," Respondent perceived that the proper course would be to work until any hour on Thursday evening until the job was complete. Not an insubstantial amount of work remained even as Respondent made that statement to the Court of Appeals. As declared in the statement, some 85 pages of the opinion were complete, some citations were still to be checked, and Respondent's secretary was still re-typing the final draft. Completion of a 98-page opinion is not a matter to be taken for granted. Therefore, Respondent's entire staff remained until the job was done: Respondent, its secretary, law clerks, and courtroom clerk.

Shortly after 2:00 a.m. on Friday, January 31, the opinion was completed. Respondent signed the opinion at that early morning hour and the deputy courtroom clerk filed the opinion in the Office of the Clerk of the United States District Court so that copying could be completed. Respondent, however, did not sign and file the judgment at that time.

The deputy courtroom clerk stayed after the rest of the staff had left the Courthouse in order to complete all

copies of the opinion for the attorneys and the public. Approximately 60 copies of the opinion were estimated for these purposes.

The Respondent and its staff returned to the Courthouse shortly before 9:00 a.m. on Friday, January 31. A synopsis of the opinion was prepared and the hour of approximately 11:00 a.m. was established as the time when *public* copies of the synopsis and opinion would be available, since that amount of time would be required to make copies of the synopsis. The deputy courtroom clerk, who had voluntarily stayed even later than the rest of the staff to copy the filed opinion, arrived after 10:00 a.m. Pursuant to earlier instructions of Respondent, she proceeded to call the numerous attorneys involved in the case to inform them that Respondent had ruled and that copies of the opinion would be available at about 11:00. Some time after 10:00 a.m., Respondent received in chambers an order of the Court of Appeals denying the petition for a writ of mandamus and the accompanying *per curiam* opinion. The Respondent immediately read and discussed that opinion with its law clerks.

Respondent found in the *per curiam* opinion that in denying the petition for writ of mandamus the Court of Appeals suggested how Respondent should proceed. The procedure outlined was that Respondent should decide the three-judge court question *prior* to ruling in the consolidated cases, even though the writ of mandamus was denied. Respondent was perplexed, needless to say. The suggested course of action was *impossible* to follow at that time because Respondent had *already acted* in the consolidated cases as promised. In view of the events as they had occurred, Respondent could not retract the opinion. However, the Respondent never filed a judgment in the case.

The inescapable conclusion from the facts as set forth herein is that Respondent effectuated its opinion in the consolidated cases, neither in violation of an order of the Court of Appeals, nor in contravention of an opinion of the Court of Appeals, nor in anticipation of an adverse decision of the Court of Appeals. Further, the Court of

Appeals' *per curiam* opinion attached to its order denying the petition for a writ of mandamus suggesting procedure in the district court was not filed until at least seven hours after Respondent had acted.

Respondent, or any member of the district court, would never act in violation of an order or opinion of this Court of Appeals, or the Supreme Court of the United States.

In addition to the foregoing, it should be noted that within three business days (February 5, 1975) following receipt of the Court of Appeals' *per curiam* opinion, this Respondent requested the convening of a three-judge court and two other judges were designated on that same day.

Respectfully submitted,

/s/ Charles R. Richey
CHARLES R. RICHEY
United States District Judge

APPENDIX B

January 31, 1975

*MEMORANDUM*

TO JUDGES: Robinson
Wilkey

RE: *Nixon v. Richey*, No. 75-1063
Petition for Mandamus

FROM: Daniel M. Cathey

This memorandum is being submitted at your request.

To the best of my recollection the following events and conversations occurred in connection with the petition for writ of mandamus filed the afternoon of January 28, 1975. The times reflected below are approximate unless marked with an asterisk—these are times when I looked at the clock in my office and made a note of it.

January 28, 1975

4:00 P.M. Petition for Writ of Mandamus referred to Court Law Clerk.

\*4:20 P.M. I called counsel for petitioner to inquire if Judge Richey had already ruled and if not when was counsel advised he may rule. Counsel referred to Judge Richey's letter and said he did not know.

4:35 P.M. I tried to contact the Civil Docket Division of the Clerk's Office of the District Court. There was no response.

4:45 P.M. I called Judge Richey's Chambers—from my prior Courtroom Clerk experience I recalled that Courtroom Clerks do on occasion pick up orders from chambers. **Judge** Richey's law clerk put Judge Richey on the telephone and Judge Richey asked me what we had. I told him a petition for writ of mandamus was filed with this office. Judge Richey advised me that his order had not been filed but he intended to rule before the end of the week.

4:55 P.M. The Court Law Clerk told me she would take the matter up with the Presiding Judge of the division to find out if action should be taken that night since Judge Richey did not tell me exactly when he would rule.

5:10 P.M. The Court Law Clerk returned and said the matter would be taken up at the motions conference.

January 29, 1975

The Petition for Writ of Mandamus was taken up orally by the Court Law Clerk at the motions conference.

\* \* \* \*

3:15 P.M. My Secretary called all counsel and read the order directing that responses be filed to the Petition for Writ of Mandamus by 4:30 P.M. Thursday, January 30, 1975, and a copy was delivered to Judge Richey's Chambers.

\* \* \* \*

January 30, 1975

3:50 P.M. Judge Richey's Secretary called me and said Judge Richey would respond to the order.

4:00 P.M. A copy of the Government's response was hand delivered by Mr. Kline to Judge Richey's Chambers.

\* \* \* \*

\*4:20 P.M. Judge Richey came to my office with his response to this Court's order. I told Judge Richey I expected something tonight, I was not sure, but in any event I would call him forthwith at his Chambers or his unlisted home telephone number which he had given me.

5:30 P.M. I called Judge Richey's Chambers and told his Secretary I was going home and gave her my home number.

January 31, 1975

\* \* \* \*

9:45 A.M. My Secretary called counsels' offices to advise of entry of the order. Mr. Bonner's Secretary went to deliver a copy of the order to Judge Richey's Chambers.

\*9:50 A.M. Judge Richey called me and asked "what did the Court do, Dan?" I read the order on the Petition verbatim and told him a copy was being delivered now to his Chambers. He said, "then the case is closed?" I read the order again and emphasized "for the reasons and on the conditions stated in attached Per Curiam opinion." He said "O.K., I'll read that." He also said he was up until 3:00 A.M. working on his opinion.

\*9:55 A.M. Mr. Bonner's Secretary returned to my office and said the order was delivered and

said before she left Judge Richey's Chambers she heard someone in the inner office say "Bring that in!"

11:15 A.M. One of the Court Law Clerk's told me Judge Richey had ruled.

11:20 A.M. I called Judge Richey's Courtroom Clerk and asked what time the order was filed. She said 11:00 A.M.

*1:27 P.M. Judge Richey's Courtroom Clerk called me back and said the opinion was filed at 2:30 A.M. but for mechanical difficulties the order was not *released* until 11:00 A.M.

1:45 P.M. Judge Richey called me and asked if his Courtroom Clerk had called. I said yes and he said he wanted the facts to be straight and the correct information to my Court to be correct.

3:00 P.M. Counsel for Petitioner filed a motion for reconsideration.

\* \* \* \*

5:00 P.M. My office called counsel to notify them of the order staying the effectiveness of Judge Richey's opinion and any orders and a copy was delivered to Judge Richey's Chambers.