514

Richard M. NIXON, Individually and as the former President of the United States, et al.

v.

Arthur F. SAMPSON, Individually and as Administrator of General Services, et al.

Appeal of REPORTERS COMMITTEE FOR FREEDOM OF the PRESS et al. (two cases).

The REPORTERS COMMITTEE FOR FREEDOM OF the PRESS et al., Appellants,

v.

Arthur F. SAMPSON, Individually and as Administrator of General Services.

Lillian HELLMAN et al.

v.

Arthur F. SAMPSON, Individually and as Administrator of General Services, et al.

Nos. 75–2194—75–2196.

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 1977.

Decided March 22, 1978.

Mark J. Spooner, Washington, D. C., with whom Robert E. Herzstein, Andrew S. Krulwich, Simon Lazarus, III and Leonard B. Simon, Washington, D. C., were on brief, for appellants.

Charles S. Rhyne, Washington, D. C., with whom William S. Rhyne and Richard J. Bacigalupo, Washington, D. C., were on brief, for appellee, Woods.

Rex E. Lee, Asst. Atty. Gen., Irwin Goldbloom, Deputy Asst. Atty. Gen. and David J. Anderson, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellees, The Administrator of Gen. Services and the Counsel to the President.

Before BAZELON, Chief Judge, LEVENTHAL and ROBINSON, Circuit Judges.

Opinion for the Court filed by BAZELON, Chief Judge.

BAZELON, Chief Judge:

Section 101(b)(1) of the Presidential Recordings and Materials Preservation Act (the Act), Pub.L. 93–526 (1974), 88 Stat. 1695, 44 U.S.C. § 2107 (Supp. V 1975), directs the Administrator of General Services (the Administrator) to take custody of all "papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical

materials of Richard M. Nixon." Appellee, Rose Mary Woods, sought to remove from the Administrator's custody approximately fifty cartons of material that she claimed was her personal property. Appellants, Reporters Committee for Freedom of the Press, et al., (Reporters Committee), sought to prevent the removal of this material until regulations implementing the Act had been promulgated by the Administrator and accepted by Congress.[1] On December 16, 1977, while this case was under consideration, these regulations became effective. 42 Fed.Reg. 63626 (1977).[2]

I

The background of this litigation is extraordinarily complex. Soon after leaving office Mr. Nixon entered into an agreement with the Administrator of General Services, Arthur F. Sampson, concerning the disposition of the former's "Presidential historical materials."[3] Mr. Nixon later brought suit in district court to enforce the implementation of this agreement. Mr. Sampson was a named defendant. Shortly thereafter two

1. Section 104 of the Act provides that:

(a) The Administrator shall, within ninety days after the date of enactment of this title, submit to each House of the Congress a report proposing and explaining regulations that would provide public access to the tape recordings and other materials referred to in section 101. Such regulations shall take into account the following factors:

(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of government power popularly identified under the generic term "Watergate";

(2) the need to make such recordings and materials available for use in judicial proceedings;

(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;

(4) the need to protect every individual's right to a fair and impartial trial;

(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

(6) the need to provide public access to those materials which have general historical

significance, and which are not likely to be related to the need described in paragraph (1); and

(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

(b)(1) The regulations proposed by the Administrator in the report required by subsection (a) shall take effect upon expiration of ninety legislative days after the submission of such report, unless such regulations are disapproved by a resolution adopted by either House of the Congress during such period.

2. This court was not informed of the effective promulgation of the regulations until February 24, 1978. The two-month delay unfortunately placed an additional burden on our deliberations and represented a level of responsibility less than we have a right to expect. *See* ABA Code of Professional Responsibility EC 7–23 (1976).

3. The agreement is reproduced in *Nixon v. Sampson,* 389 F.Supp. 107, 160–62 (D.D.C. 1975) (Appendix A).

groups of plaintiffs, of which Reporters Committee was one, brought suit seeking to have these materials declared the property of the United States government, to enjoin their transfer to Mr. Nixon, and to gain access to them under the Freedom of Information Act. In one action Mr. Nixon was a named defendant, in another he was permitted to intervene. These two actions were ultimately consolidated with the suit brought by Mr. Nixon; the Watergate Special Prosecutor and Jack Anderson, a newspaper columnist, were both permitted to intervene in Mr. Nixon's suit, the former as a defendant and the latter as a plaintiff. *See Nixon v. Administrator of General Services,* 408 F.Supp. 321, 331–32 (D.D.C. 1976); *Nixon v. Sampson,* 389 F.Supp. 107 (D.D.C.1975). These actions came collectively to be known as the "consolidated cases."

On December 20, 1974, the day after the Act was signed into law, Mr. Nixon brought suit challenging its constitutionality. We stayed all action in the consolidated cases until the Act's constitutionality could be determined. *Nixon v. Richey,* 168 U.S.App. D.C. 172, 513 F.2d 430 (1975). However, on August 7, 1975, appellee Rose Mary Woods sought leave to intervene in the consolidated cases in order to recover what she claimed were her personal papers. On September 2, we granted leave to intervene and modified our stay "to enable the District Court, in its discretion, to enter an order . . . to authorize the return of the materials sought, nothing herein contained being intended to intimate any view as to the disposition by the District Court of any applications which may be made to it." Joint Appendix (J.A.) at 35.

Ms. Woods subsequently intervened in the consolidated cases. She claimed that Ms. Mary M. Filippini, Administrative Assistant for the Office of Presidential Materials at the General Services Administration and prior to that a staff member of the Office of Presidential Libraries at the National Archives and Records Service, had examined certain materials and prepared a

"List F" containing items that were "solely the personal materials and papers" of Ms. Woods.[4] Ms. Woods sought to recover the approximately fifty cartons of material enumerated in List F. She appended an affidavit of Ms. Filippini in which the archivist stated that she had personally inspected and compiled List F, and that:

> Basing my judgment on the same criteria used in collecting Nixon Presidential Materials from other White House staff members and staff offices prior to and since August 9, 1974, I find none of the items described on "List F" . . . to be "Presidential historical materials of Richard M. Nixon."

J.A. at 89. Ms. Filippini appended to her affidavit an "Exhibit I" containing the "criteria" she had used in compiling List F. This Exhibit I was a White House memorandum of August 9, 1974, stating that:

> Personal files include correspondence unrelated to any official duties performed by the staff member; personal books, pamphlets and periodicals; daily appointment books or log books; folders of newspapers or magazine clippings; and copies of records of a personnel nature relating to a person's employment or service.

J.A. at 91. "Personal files" were those not considered to be historical materials.

Defendant Sampson answered Woods' complaint and stated that he did not oppose her requested relief. No opposition was voiced by the Special Prosecutor or by any other defendant. Reporters Committee, however, a plaintiff in the case below, filed a "Protective Answer" opposing Woods' complaint and denying that the materials sought were her personal property. J.A. at 116–18.

On November 19, Ms. Woods filed a motion for judgment on the pleadings stating that the contents of the Filippini affidavit were admitted by defendant Sampson "and remain uncontroverted." J.A. at 125–26. Despite the opposition of Reporters Committee, the district court granted Ms. Woods' motion on December 2, 1975. It

4. Complaint ¶ 11; J.A. at 38.

noted specifically that "Defendants do not oppose the relief sought by Plaintiff-Intervenor." J.A. at 149.

Reporters Committee appealed. Defendant Sampson has filed a brief in this court arguing that the district court's decision should be upheld.[5]

On March 25, 1976, before oral argument was held on appeal, this court ordered the parties to begin negotiations so as "to stipulate those materials as to which no controversy exists." We took this step because it appeared "that at least a substantial number of the materials enumerated in List F are so plainly the personal and private property of appellee Woods and so lacking in historical or commemorative value or significance as to preclude any colorable claim that they fall within the reach of Section 101 of the Presidential Recordings and Materials Preservation Act. . . . "

By the time of oral argument well over half of the materials on List F had been released to Ms. Woods because the parties had stipulated that they were so plainly lacking in historical significance as to preclude any colorable claim that they fell within the reach of Section 101 of the Act.[6]

## II

Section 104(a) of the Materials Preservation Act, *supra* note 1, directs the Administrator to "submit to each House of the Congress a report proposing and explaining regulations that would provide public ac-

cess" to the Presidential historical materials controlled by the Act. These regulations, however, were not in effect when Rose Mary Woods intervened in the consolidated cases to obtain the return of what she claimed were her personal papers. The ruling of the district court was thus that the affidavit of Ms. Filippini was sufficient, in the absence of such regulations, to establish that the materials sought by Ms. Woods were not within the purview of the Act. The regulations subsequently promulgated, however, set forth standards defining more fully the nature of the materials controlled by the Act and created an elaborate procedural system for the evaluation and transfer of materials according to these standards. 42 Fed.Reg. 63626 (1977). We need not reach the question whether the establishment of this procedural system, by itself, constitutes sufficient grounds now to dismiss Ms. Woods' suit, *see Bradley v. School Board of City of Richmond,* 416 U.S. 696, 720, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Nixon v. Administrator of General Services,* 433 U.S. 425, 459 n. 22, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), since we hold that the criteria used by Ms. Filippini in compiling List F were not in accordance with the standards required by the Act.

We view the essential question in this case to be the meaning of the "Presidential historical materials" over which Section 101(b)(1) of the Act directs the Administra-

---

5. In his brief, Sampson argues that "any undue delay after Miss Woods' demand was made might well subject the United States to a claim for just compensation if its retention of those materials resulted in depriving her of personal property. By disputing the government and Miss Woods and delaying the ultimate resolution of this matter, appellants have substantially increased the exposure of the United States to such a recovery. In order to protect against this eventuality, the government intends to make a request for security from the appellants in the district court if this court takes any action other than an outright affirmance." Br. at 7–8.

Compensation for the deprivation of personal property is authorized by § 105(c) of the Act:

If a final decision of such court holds that any provision of this title has deprived an individual of private property without just

compensation, then there shall be paid out of the general fund of the Treasury of the United States such amount or amounts as may be adjudged just by that court.

6. At oral argument counsel for appellants described these materials as consisting chiefly of "stenographic pads, ballpoint pens, books, and the like." As for these materials, no present controversy exists, and they are no longer part of this case.

The materials that remain in controversy include files labelled: "Tapes—Gap Problems of Others"; "Butterfield, Alex (re: tapes)"; "Buzhardt Testimony (questions)"; "Logs"; "Rebozo, C.G."; "Tapes—Access (TSD handling of)"; "Mitchell"; "Safe Access Long—Oct. 4–7, 1973, Key Biscayne"; "Stans, Maurice"; "Panel (Tape Gap)."

tor of General Services to acquire custody.[7] Section 101(b)(2) states that, "[f]or purposes of this subsection, the term 'historical materials' has the meaning given it by section 2101 of Title 44, United States Code." Appellee argues that § 101(b)(2) thus "adopts the standard of the archival art current at the time of the Act (December 19, 1974) without reference to regulations." Brief for appellee at 21. Since appellee claims that Ms. Filippini used this standard in compiling List F, she urges that the district court's judgment be affirmed.

■ Section 2101 of Title 44 of the United States Code, however, defines historical materials to include "books, correspondence, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, motion pictures, sound recordings, and other objects or materials having historical or commemorative value." While this definition details with some particularity the meaning of the term "materials," it provides little if any assistance in deciding which of these materials are of historical value. The deliberate vagueness of the section suggests that Congress intended this decision to be made in the context of surrounding circumstances, and specifically with reference to the purposes of the Materials Preservation Act. This conclusion is supported by the legislative history of the Act, which also indicates that Congress intended the Administrator's regulations to develop guidelines, based in part on the experiences of Watergate, to determine which materials would be controlled by the Act.[8]

The criteria Ms. Filippini used to compile List F, however, were developed before the passage of the Act and before the promulgation of the Administrator's regulations. Exhibit I, which Ms. Filippini states sets forth the criteria she used in gathering List F, is dated August 9, 1974;[9] indeed, Ms.

---

7. This is a question of statutory construction. We are not persuaded by appellee's argument that our decision is controlled by "the doctrine of Law of the Case." Brief for appellee at 22. Our September 2 order specifically declined to express or "intimate any view as to the disposition by the District Court of any applications which may be made to it." Nor are we persuaded by appellee's argument that judgment was appropriate in the proceeding below because no "defendant" objected to the release of the materials. Although the district court mentioned this fact in its order, J.A. at 149, the realistic alignment of the parties must be considered. Reporters Committee was formally a plaintiff in the consolidated cases, as was Woods, but it was in fact the party in an adversary relation with Woods in this matter.

8. Section 104(a) of the Act requires the Administrator, in formulating regulations, to take into account several factors, including the need to inform the public about Watergate (§ 104(a)(1)), the need to provide public access to materials of "general historical significance" (§ 104(a)(6)), and "the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in [§ 104(a)(1)] and are not otherwise of general historical significance." § 104(a)(7). *See Nixon v. Richey,* 168 U.S.App.D.C. 172, 186, 513 F.2d 430, 444 (1975). Senator Nelson, a sponsor of S. 4016, which would eventually become the Materials Preservation Act, stated that, since it would be "difficult within a short time to draft regulations governing public ac-

cess" which would accommodate these competing interests, the Administrator's regulations, together with their accompanying report, would "recommend which materials of historical significance should be retained." 120 Cong. Rec. 33851 (1974). Senator Ervin, another of the Bill's sponsors, stated that in drafting these regulations the Administrator should call upon the advice of the Special Prosecutor's office. *Id.* at 33856. When Congressman Brademas, one of the primary supporters of S. 4016 in the House, was asked why the Administrator, who had entered into the original argument with Mr. Nixon, *see* note 3 *supra,* should now be trusted to draft such important regulations, the Congressman replied:

> It is precisely because of the apprehension of the members of the committee with respect to that particular point that the bill contains language which directs the Administrator to submit to Congress, within 90 days after the enactment of the measure, regulations which would provide public access to the materials.
> Secondly, it is precisely because we shared that apprehension that those regulations would not go into effect without an opportunity for both the House and Senate to review the regulations and to exercise a veto if we disapprove of them.

*Id.* at 37903.

9. The Act was passed by Congress on December 10, 1974, and was signed into law on December 19. The Administrator's regulations became effective on December 16, 1977.

Filippini is quite frank in stating that her judgment was based "on the same criteria used in collecting Nixon Presidential Materials from other White House staff members and staff offices prior to and since August 9, 1974." J.A. at 89. We find that these criteria are not consonant with the purposes of the Materials Preservation Act. For example, § 104(a)(1) of the Act speaks of "the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term Watergate . . . ." *See Nixon v. Administrator of General Services,* 433 U.S. 425, 452–53, 97 S.Ct. 2777, 2795, 53 L.Ed.2d 867 (1977). Many of the abuses of power involved in Watergate were "unrelated to any official duties," yet under the criteria of Exhibit I it appears that reference to such activities in correspondence would be labeled "personal" and found to be not Presidential historical materials. Similarly, the criteria employed by Ms. Filippini would apparently categorize as personal and not Presidential historical materials the "daily appointment books or log books" that constituted such important evidence in the Watergate affair. Moreover § 104(a)(6) of the Act speaks of "the need to provide public access to those materials which have general historical significance." The criteria of Exhibit I do not articulate this concern.

Our conclusion that the criteria of Exhibit I are not compatible with the purposes of the Act is supported by the regulations promulgated by the Administrator. Under these regulations the Administrator will specifically retain control over materials related to abuses of governmental power popularly identified under the generic term "Watergate." [10] *See* 42 Fed.Reg. 63628 (1977) (to be codified in 41 C.F.R. § 105–63.-401–5). The regulations also have a more inclusive definition of "Presidential historical materials" than that expressed in Exhibit I:

(a) *Presidential historical materials.* The term "Presidential historical materials" (also referred to as "historical materials" and "materials") shall mean all papers, correspondence, documents, pamphlets, books, photographs, films, motion pictures, sound and video recordings, machine-readable media, plats, maps, models, pictures, works of art, and other objects or materials made or received by former President Richard M. Nixon or by members of his staff in connection with his constitutional or statutory duties or political activities as President and retained or appropriated for retention as evidence of or information about these duties and activities. Excluded from this definition are documentary materials of any type that are determined to be the official records of an agency of the Government; private or personal materials; stocks of publications, processed documents, and stationery; and extra copies of documents produced only for convenience of reference, when they are clearly so identified.

(b) *Private or personal materials.* The term "private or personal materials" shall mean those papers and other documentary or commemorative materials in any physical form relating solely to a person's family or other nonpublic activities, and having no connection with his constitutional or statutory duties or political activities as President or as a member of the President's staff.

10. The regulations define the term "abuses of governmental power popularly identified under the generic term 'Watergate'" to mean:

those alleged acts, whether or not corroborated by judicial, administrative or legislative proceedings, which allegedly were conducted, directed, or approved by Richard M. Nixon, his staff or persons associated with him in his constitutional, statutory or political functions as President, and (1) are or were within the purview of the charters of the Senate Select Committee on Presidential Campaign Activities or the Watergate Special Prosecutor Force; or (2) are circumscribed in the Articles of Impeachment adopted by the House Committee on the Judiciary and reported to the House of Representatives for consideration in House Report No. 93–1305.
42 Fed.Reg. 63626 (to be codified in 41 C.F.R. § 105–63.104(c)).

42 Fed.Reg. 63626 (1977) (to be codified in 41 C.F.R. § 105–63.104(a), (b)). Whereas the criteria of Exhibit I would require that that "correspondence unrelated to any *official* duties" be returned to Ms. Woods, the regulations would classify as "private or personal materials" only those "having no connection with . . . constitutional or statutory duties or *political activities* . . . ." The "daily appointment books or log books" that the criteria of Exhibit I would categorize as personal would, under the regulations, be considered at least prima facie Presidential historical materials, since they constitute "evidence of or information about" such constitutional or statutory duties or political activities.

■ The criteria used in compiling List F thus not having been in accordance with statutory standards, the district court was incorrect in granting judgment on the pleadings. Since an elaborate regulatory scheme has now been established by the Administrator, the most appropriate dispo-sition of this case is to dismiss appellee's suit without prejudice, and to remand her to her administrative remedies. Should those remedies prove unavailing, she will be able at that time to seek judicial review under § 105(a) of the Act.[11] Since appellee will not be harmed by dismissal, there is no reason for the district court to retain jurisdiction. *See United States v. Michigan National Corp.*, 419 U.S. 1, 5, 95 S.Ct. 10, 42 L.Ed.2d 1 (1974).

The judgment of the district court is therefore reversed and the case is dismissed without prejudice.

*So ordered.*

11. Section 105(a) states:
    The United States District Court for the District of Columbia shall have exclusive jurisdiction to hear challenges to the legal or constitutional validity of this title or of any regulation issued under the authority granted by this title, and any action or proceedings involving the question of title, ownership, custody, possession, or control of any tape recording or material referred to in section 101 or involving payment of any just compensation which may be due in connection therewith. Any such challenge shall be treated by the court as a matter requiring immediate consideration and resolution, and such challenge shall have priority on the docket of such court over other cases.
    Appellee argues that § 105(a) provides an independent "jurisdictional basis" for the district court to determine, apart from the Administrator's regulations, if "the papers here involved are the personal property of Ms. Woods and not Presidential historical materials." Brief for appellees at 8, 28–30.
    Whether or not § 105(a) confers such jurisdiction, we hold that the district court should defer in the first instance to the Administrator's regulatory scheme. The Supreme Court has emphasized "the Act's requirement that the Administrator of General Services administer the . . . materials placed in his custody only under regulations promulgated by him providing for the orderly processing of such materials for the purpose of returning to [Mr. Nixon] such of them as are personal and pri-vate in nature . . . ." *Nixon v. Administrator of General Services*, 433 U.S. 425, 436, 97 S.Ct. 2777, 2786, 53 L.Ed.2d 867 (1977). If § 105(a) were interpreted as authority for district courts to determine *ad hoc* whether particular items were "Presidential historical materials," it would constitute a virtual invitation to bypass the "orderly processing" of such items "under regulations promulgated by" the Administrator. We decline to interpret § 105(a) in a manner so contrary to the central import of the Act.
    Although appellee has informed us by way of a motion for summary affirmance that the Administrator's regulations are presently under constitutional attack, *see Nixon v. Soloman*, C.A. No. 77–1395 (D.D.C.), we see no reason to alter our judgment. Even if the pending lawsuit were to delay the effective operation of the regulations, Ms. Woods has demonstrated no irreparable injury that will occur if she is required to wait, like the rest of the White House staff, until the regulations are fully operational. Indeed, over half the materials she seeks have already been returned to her. Particularly with respect to those materials that the parties have been unable to stipulate are "so lacking in historical or commemorative value or significance as to preclude any colorable claim that they fall within the reach of Section 101," the purposes of the Act will be best served if we defer to the authoritative definitions and procedures of the Administrator.