Harry R. HALDEMAN, Plaintiff,

v.

Rowland G. FREEMAN, III, et al., Defendants.

No. CA 80–3250.

United States District Court, District of Columbia.

Feb. 28, 1983.

John J. Wilson, Frank H. Strickler, Washington, D.C., for plaintiff.

Loretta Reid Pitt, Federal Program Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## OPINION

JOHN GARRETT PENN, District Judge.

Harry R. Haldeman, former White House Chief of Staff, filed this action against Rowland G. Freeman, III, Administrator of the General Services Administration, Robert Warner, Archivist of the United States, Richard A. Jacobs, Assistant Archivist, and the United States of America, pursuant to section 105(a) of the Presidential Recordings and Materials Preservation Act ("the Act"), 44 U.S.C. § 2107 note (1974). He seeks damages for the seizure and retention of his personal property by defendants since April 30, 1973.

I

Plaintiff was White House Chief of Staff from January 20, 1969 until April 30, 1973, when his resignation was accepted by President Richard M. Nixon. Complaint ¶¶ 7, 8. The next day, May 1, 1973, plaintiff's office at the White House was sealed pursuant to the direction of President Nixon and then Attorney General, Elliot Richardson. Complaint ¶ 9; Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment at 1.

Among the materials included in the sealing were journals and audio tapes comprising plaintiff's personal diary. Complaint ¶¶ 9, 13, 14; Plaintiff's Statement of Material Facts ¶ 2. The parties agree that the diary was "personal and private" as the term is defined by the Act. *See* Defendants' Response to Plaintiff's Statement of Material Facts ¶ 4.

On May 25, 1973 plaintiff's files became the subject of a Grand Jury subpoena. Five days later Watergate Special Prosecutor, Archibald Cox, directed White House officials to secure the files and prohibit the removal of any papers.[1] Exhibits 4, 5, Defendant United States' Motion for Summary Judgment; Complaint ¶ 11.

President Gerald R. Ford signed the Act into law on December 19, 1974, four months after the resignation of Richard M. Nixon as President of the United States. The next day, Nixon instituted an action challenging the constitutionality of the Act. *Nixon v. Administrator of General Services,* 408 F.Supp. 321 (D.D.C.1976), *aff'd,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). During the pendency of that action plaintiff's materials were retained by White House Counsel. Affidavit of Richard A. Jacobs ¶¶ 4, 5.[2] Moreover, this Court enjoined the Administrator of General Serv-

---

1. Plaintiff disputes that the diary was subject to Archibald Cox's request. Memorandum in Opposition to Defendants' Motion for Summary Judgment at 3. This is not a material disagreement.

2. At the time of his affidavit, August 11, 1981, Richard A. Jacobs was an employee of the

National Archives and Record Service (NARS), General Services Administration. During the period 1977–1980 he was Acting Director of the Nixon Presidential Materials Staff. Jacobs Affidavit ¶ 2. Plaintiff does not contest the assertions made by Jacobs.

ices from processing files under the Act, pending a final disposition of Nixon's action. *See Nixon v. Administrator of General Services,* 408 F.Supp. at 374–375.

On July 28, 1977 the Supreme Court upheld the constitutionality of the Act. *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Shortly thereafter, on August 9, 1977, plaintiff's papers were removed to the vault area in the National Archives. Complaint ¶ 12; Defendant United States' Statement of Material Facts ¶ 8.

Congress approved the regulations promulgated to implement the Act—41 C.F.R. Part 105–63—on December 12, 1977, and archival processing began one month later on January 16, 1978. Jacobs Affidavit ¶ 7.

On January 5, 1979 plaintiff commenced litigation in this Court[3] for the return of his journals and tapes. That action was settled in the following manner:

(1) [The National Archives and Record Service, General Services Administration (NARS)], in the course of normal processing, examined the Haldeman files and determined which materials were personal and returnable to Mr. Haldeman; (2) NARS reviewed the subject journal and audio cassettes to locate, identify and reproduce all possible security classified portions; (3) NARS transmitted these portions to the National Security Council for classification review; (4) copies of all journals and tapes were provided to Mr. Haldeman except for security classified material; and (5) Mr. Haldeman donated the original materials to NARS.

Jacobs Affidavit ¶ 13. Plaintiff then executed a deed of gift, entitled Gift of Papers and Other Historical Materials of H.R. Haldeman to Richard M. Nixon Presidential Library, on March 27, 1980, in which he donated the materials to the United States. *Id.* On November 5, 1980 plaintiff received the last installment of a copy of his diary with national security information removed. *Id.;* Memorandum in Opposition to Defendants' Motion for Summary Judgment at 5.

The instant action, in its present posture,[4] seeks compensation from the United States, pursuant to Sections 105(a) & (c) of the Act, for the deprivation of plaintiff's personal and private property from May 1, 1973 until November 5, 1980. Complaint Count IV; Memorandum in Opposition to Defendants' Motion for Summary Judgment at 7.

The case is presently before the Court on plaintiff's motion for partial summary judgment (on the issue of liability), and the cross-motion of the United States for summary judgment.

II

The United States contends that no taking has occurred because there was no intent to convert plaintiff's property for a public use and because the public interest in governmental regulation outweighs any harm to plaintiff caused by archival processing.

Plaintiff points out that the argument of the United States derives from precedent developed under the taking clause of the fifth amendment to the United States Constitution,[5] whereas § 105(c) of the Act[6]

---

3. Plaintiff asserts that he first sought return of the diary on October 8, 1975 when his attorney requested that he be allowed to take an inventory of his personal papers. This request was denied by the government. Plaintiff instituted a lawsuit to recover possession of the diary on October 16, 1978. *Haldeman v. Solomon,* CA 78–1928 (D.D.C.1978). That action was dismissed as not being ripe since archival processing had not been completed, and the appeal from this Court's ruling was dismissed as moot. Plaintiff then attempted to retrieve his diary through an action under the Freedom of Information Act. *Haldeman v. General Services Administration,* CA 79–0932 (D.D.C.1980). That case was voluntarily dismissed without prejudice, by stipulation on April 24, 1980.

4. On October 26, 1981 plaintiff filed a praecipe acquiescing in Defendant United States' motion for judgment on the pleadings as to Counts I, II and III of the Complaint, in Defendants Warner and Jacobs' motion to dismiss or, in the alternative, for summary judgment, and in the motion to dismiss filed on behalf of defendant Freeman.

5. The fifth amendment provides: "nor shall private property be taken for public use, without just compensation."

6. Section 105(c) of the Act provides:
   If a final decision of [the United States District Court for the District of Columbia] holds that any provision of this title has deprived

merely requires that a person be deprived of his/her property without just compensation. Intent and a balancing of the public interest against harm to the plaintiff are not, therefore, prerequisites to compensation of an owner under the Act. As a contingent argument, plaintiff asserts that a fifth amendment taking has occurred.

### III

### A

While this case arises under statute, not the Constitution, this Court may nevertheless look to constitutional precepts for instructive parallels as long as there is no conflict with the plain language of the relevant statute.[7] Moreover, it will not be necessary for this Court to become entrenched in the niceties of fifth amendment doctrine, in this case, as much of the dispute will be resolved by the answer to the following question: Why did plaintiff leave his diary in his office at the White House when he vacated it on April 30, 1977?

Exhibits 1, 2 and 3 of Defendant United States' Cross-Motion for Summary Judgment are transcripts of conversations between plaintiff and President Nixon in the Oval Office on May 2, May 9, and April 9, 1973, respectively. After reading the transcripts, one ineluctable conclusion must be reached: Plaintiff left his files, including his diary, in the White House so President Nixon could assert ownership of them, claim the executive privilege, and refuse to release them.[8] Plaintiff was attempting to

---

an individual of private property without just compensation, then there shall be paid out of the Treasury of the United States such amount or amounts as may be adjudged just by that court.
44 U.S.C. § 2107 note.

7. Section 105(c) and the taking clause are, in fact, based on the same principles. *See Nixon v. Administrator of General Services,* 408 F.Supp. at 355 n. 49.

8. Plaintiff does not dispute that "two days after Mr. Haldeman's resignation, plaintiff indicated to former President Nixon that all of his files 'belong to the President' and that they should remain in the White House." Defendant United States' Statement of Material Facts as to Which There is No Genuine Issue ¶ 3. Moreover, the transcripts, the authenticity of which plaintiff does not dispute, unambiguously indicate that the purpose for establishing Nixon's ownership was so he could refuse to release plaintiff's files pursuant to the executive privilege.

President [P]: I should think that, do you think that I just take the line those files belong to me?
Haldeman [H]: Absolutely.
P: And, uh, and then when they subpoena anything you could say, you could, uh, you only, you only have things that have to do with uh, . . .
H: They can't go into anything; they're your files.
Exhibit 1, Defendant United States' Motion for Summary Judgment, Conversation between plaintiff and President Nixon in the Oval Office on May 2, 1973.

P: Oh, one thing I was going to say to you is this, that we're gonna have to, you know, as you know, the executive privilege thing they've sort of gotten it distorted a bit too much in terms of the fact that, uh, even if illegal activities were discussed with, uh, you know, in the President's, as you know, for the President and so forth, that that was not it [unintelligible], you know what I mean?

\* \* \* \* \* \*

H: Well, well, if, if we let down privilege in such a way that enables them to take my notes, . . .
P: Oh, no, no, no, no, no, no.

\* \* \* \* \* \*

P: Those are my papers.
H: See, those pap—. . .
P: Those are, papers are mine.
H: . . . those papers . . .
P: No, no papers.
H: If I have, if I have to turn those over, . . .
P: No, no, but what I was thinking, uh, on that, now just to talk a minute about that, that. The papers, Bob, basically, all papers are, are, uh, belong to the President. . .
H: Right.
P: . . . and your notes belong to the President. . .
H: Right.
P: . . . and, uh, and I was, and, and, uh, we've, I've talked to Al, and I said there is an absolute line on that, absolute line. . .
H: Right.
P: . . . none, no presidential papers, but you can talk on, I think, and for, not even your diary, I mean, not even your, uh, you know, your, your log book, not a damn thing, no papers whatever.
H: Well, see, all that log book is, is, as you know, is a, a distillation. . .

immunize his papers from subpoena, and he believed, albeit incorrectly, that the only way to accomplish this result was to establish that his papers belonged to the President.

Many times during the conversations between plaintiff and the President, plaintiff unequivocally stated that his files belonged to the President. In this action, however, plaintiff alleges he was unlawfully deprived of his personal papers.[9] These assertions are, of course, inconsistent.

It is axiomatic that plaintiff must show an interest in the property taken to be entitled to compensation for any loss. Only the owner at the time of taking may seek compensation. 29A C.J.S. *Eminent Domain* § 196 (1965); *cf. United States v. 677.50 Acres of Land in Marion County, Kansas,* 420 F.2d 1136, 1140 (10th Cir.1970), *cert.*

denied, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90 (1970) (must be a nexus between the alleged interest and the property taken). This is equally true in situations arising under the Act as it only intends for compensation to be paid to owners of property.[10]

An owner of personal property[11] loses his/her right to compensation by abandoning the property. *Lemmons v. United States,* 496 F.2d 864, 872–873 (Ct.Cl. 1974); *Acme Ribbon Mills v. City of New York,* 30 N.Y.S.2d 369, 371 (N.Y.Sup.Ct. 1941), *aff'd,* 266 A.D. 656, 41 N.Y.S.2d 201 (1943); 29A C.J.S. *Eminent Domain* § 108 (1965). Intent to abandon may be inferred from the facts. *Lemmons,* 496 F.2d at 873. In this case plaintiff voluntarily disassociated himself from his personal property, and

---

P: Yeah.
H: ... of my notes and, and, uh, ...
P: Yeah, yeah.

    \*    \*    \*    \*    \*    \*

P: No, no, no. No, we're not going to let your notes, uh, ...
H: And that....
P: ... uh, your notes, your notes belong to the President...
H: That's exactly right.
P: ... on all subjects.
H: And fortunately, they're in the, in your possession; they're not in mine.

    \*    \*    \*    \*    \*    \*

P: ... and don't worry about those notes, don't worry about those notes.
H: If we....
P: They're mine, I bel—, they belong to me. It's like that, it's like that damn Henry's notes, you know. Henry's got notes of things that he's taken. He's not going to let his notes ever be put out...
H: That's right.
P: ... 'cause they're, they belong to me.

Exhibit 2, Defendant United States' Motion for Summary Judgment, Telephone conversation from President Nixon in the Oval Office to Plaintiff on May 9, 1973.

Thus, no genuine issue of material fact exists regarding the conclusions reached on this point.

9. In his Complaint plaintiff alleges that he was denied access to most of his personal papers during the relevant period. *Complaint* ¶ 11. The United States states that Haldeman was granted access to the files on nineteen separate occasions between May 1973 and November 1974. *See* Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judg-

ment and in Support of Defendant United States' Cross-Motion for Summary Judgment at 8; Response of Defendant United States to Plaintiff's First Request for Production of Documents, No. 6. Plaintiff counters by asserting that he was denied meaningful access to his files. Memorandum in Opposition to Defendants' Motion for Summary Judgment at 2–3. It appears to the Court that photocopying was permitted for a limited period of time. *Id.* at Exhibits 2, 4. This dispute would create a genuine issue of material fact on the issue of damages.

10. In a similar vein, the owner of the targeted property is the only person with standing to object to condemnation proceedings. *Benitez v. Bank of Nova Scotia,* 141 F.2d 942, 951 (1st Cir.1944); *C.M. Patten & Co. v. United States,* 61 F.2d 970, 972–973 (9th Cir.), *decree vacated as moot,* 289 U.S. 705, 53 S.Ct. 687, 77 L.Ed. 1462 (1932); *see generally* 29A C.J.S. *Eminent Domain* § 95 (1965). The owner must establish a "private interest" in the property at issue, in accordance with the general principle that "one can only obtain relief where it is shown that he has suffered special damages, or injury different and distinguishable from his injury as a member of the public at large \* \*." *C.M. Patten & Co.,* 61 F.2d at 972.

11. The taking clause of the fifth amendment covers personal property as well as real property. 29A C.J.S. *Eminent Domain* § 108 (1965). The Act, of course, contemplates compensation for deprivation of personal property. *See Nixon v. Administrator of General Services,* 408 F.Supp. at 355 n. 49.

expressly asserted the ownership of another person, solely for his own personal benefit. His acts were definite and certain in their terms, and fully constituted an abandonment of the property.

■ Another way an owner will lose his/her right to assert an interest in property is to become estopped from asserting an interest as a result of antecedent acts. 29A C.J.S. *Eminent Domain* § 208 (1965); *cf. Mills v. City of New York,* 269 A.D. 306, 55 N.Y.S.2d 538, 542 (1945), *aff'd,* 295 N.Y. 879, 67 N.E.2d 518 (1946) (having sold their property plaintiffs were estopped from seeking damages due to a street closing). From this vantage point, plaintiff should be estopped by his denial of ownership—a statement made to protect his ostensible interests—to later seek damages for the taking of the property.

**B**

■ As early as October 8, 1975 plaintiff began to seek return of his diary.[12] An argument could be made that this was a reassertion of ownership and he is, thus entitled to compensation for deprivation of his property thereafter, until November 5, 1980.

From October 5, 1975 through July 28, 1977 the government was enjoined from processing any files in its custody falling within the coverage of §§ 101(a) & (b) of the Act,[13] except as specifically provided. *Nixon v. Administrator of General Services,* 408 F.Supp. at 375. In *Hurtado v. United States,* 410 U.S. 578, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1972), the Court held that there is a public obligation to provide evidence and, therefore, the pretrial incarceration of a material witness is not a taking under the fifth amendment for which compensation is due. The Court's conclusion was predicated on the principle that "the Fifth Amendment does not require that the Government pay for the performance of a public duty it is already owed." 410 U.S. at 588. This rule is equally applicable to a plaintiff's duty to suffer the inconvenience concomitant with a court's order to maintain the status quo pending final resolution of a case. Plaintiff has no right to compensation during that period.

■ On August 9, 1977 plaintiff's diary was transferred to the National Archives. It was returned approximately three years later. While *Nixon v. Administrator of General Services, supra,* upheld the constitutionality of the archival processing procedure, it did not recommend a reasonable time frame for return of "personal and private" materials.

The Court must decide whether plaintiff is entitled to compensation for the deprivation of his property during archival processing. Several doctrines are pertinent to this inquiry. For example, one could ask whether regulatory processing is an exercise of governmental power which does *not* trigger taking doctrine, whether there would come a time during regulatory processing when, notwithstanding lack of intent to deprive,[14] the government had de-

12. *See* note 3, *supra,* and accompanying text.

13. Based on the wording of a letter written by White House Counsel Philip W. Buchen, plaintiff contends that the United States admits his diary was not subject to Judge Richey's Order in *Nixon v. Sampson,* CA 79–1518 (D.D.C. Oct. 21, 1974), restricting the movement of Nixon's materials. Memorandum in Opposition to Defendants' Motion for Summary Judgment at 4 & Exhibit 6. Notwithstanding plaintiff's semantic interpretation of the letter in question, it is clear that the Order in *Nixon v. Administrator of General Services,* discussed in the text, pertains to plaintiff's diary, as the diary was transferred for archival processing, pursuant to the direction in the Order only after the case was finally resolved. Thus, there is no

need to interpret the Order in *Nixon v. Sampson.* Nevertheless, it is manifest from the language in *Nixon v. Sampson* that plaintiff's diary was intended to be the subject of that Order. In that case Rose Mary Woods was allowed to intervene to obtain release of pens, pads and books; inherently private property, lacking in any commemorative or historical value. *See Nixon v. Sampson,* 188 U.S.App.D.C. 251, 580 F.2d 514, 517 (1978). If her material was subject to the Court's jurisdiction, then a fortiori plaintiff's diary was under the Court's jurisdiction in that case.

14. While the Court previously noted plaintiff's argument that the Act might not require intent to take as a prerequisite to compensation, note

layed returning plaintiff's personal papers for so long that there would be a denial of due process constituting an unlawful taking, or whether plaintiff owed the government the civic duty of subjecting his papers to archival processing for however long it took. *See generally, Hurtado v. United States, supra,* 410 U.S. at 588, 93 S.Ct. at 1163–64 (fifth amendment does not require government to pay for performance of a public duty it is already owed); *Nixon v. Sampson,* 188 U.S.App.D.C. 251, 254 n. 5, 580 F.2d 514, 517 n. 5 (1978) (undue delay in its retention of an individual's personal property increases exposure of the United States under § 105(c) of the Act); *Sierra Club v. Environmental Protection Agency,* 176 U.S.App.D.C. 335, 540 F.2d 1114, 1140 (1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977) (regulation of land does not *ordinarily* constitute a taking under the fifth amendment).

In the context of this case there is no need to vigorously examine these concepts. First, the Court finds that the three year delay between initiation of processing and final return of the diary was eminently reasonable due to the volume of materials involved and the surrounding circumstances of this case. Less than one year after processing began plaintiff initiated litigation for the return of his diary. Upon settlement of that action plaintiff donated his diary to the United States and return of his diary commenced. While three years elapsed, processing continued throughout and plaintiff ultimately received a copy of

his diary. Finally, there is no allegation that the government dragged its heels or otherwise abused the process.

Second, the entire dispute herein was engendered by plaintiff's decision not to assert ownership of the diary when he left the White House, and any damages suffered [15] would have been avoided if plaintiff had made photocopies. The purpose of archival processing was to segregate plaintiff's personal papers from those belonging to the United States, and plaintiff's failure to provide guidance and assistance (by first denying ownership and then asserting it) surely exacerbated the already inherently difficult process. Thus, if archival processing took longer than it should have taken plaintiff only has himself to blame. He could have obviated this entire conflict; he chose another route solely for his own protection, and should not now be given a forum to complain that he did not choose wisely.

■ Hence, even if the Court found that plaintiff reasserted his property interest on or after October 8, 1975, and that this reassertion had legal significance, plaintiff would not have a claim for damages from that time until November 5, 1980.[16]

An appropriate Order, consistent with this Opinion, was issued on February 28, 1983.

## ORDER

In view of the Opinion entered in the above-captioned case on February 28, 1983, it is hereby

---

49 in *Nixon v. Administrator of General Services, see* note 7 *supra,* suggests that compensation under the Act may be triggered by a fifth amendment type taking, which does require intent. Of course, even if there is no express intent, it may be implied if the government maintains possession for an unreasonably long period of time. *See Foster v. United States,* 607 F.2d 943, 950 (Ct.Cl.1979). Due to the reasoning of this memorandum this issue is not material.

**15.** The United States argues that plaintiff's only allegation of damages was lost profits from his book *The Ends of Power. See* Memorandum of Defendant United States at 10, 21–22. While these damages are speculative, and are mitigated by the fact plaintiff could have

photocopied his diary, the Court does not have to reach the issue of damages here.

**16.** Alternatively, it is a well established principle of fifth amendment law "that '[since] compensation is due at the time of taking, the owner at that time, *not the owner at an earlier or later date,* receives the payment.'" *United States v. Dow,* 357 U.S. 17, 20–21, 78 S.Ct. 1039, 1044, 2 L.Ed.2d 1109 (1958) (citations omitted) (emphasis added). The taking occurs when the United States takes possession. *Id.* at 21, 78 S.Ct. at 1044. Plaintiff would, therefore, not be entitled to compensation here, as the significant date was the date of sealing, May 1, 1973, and plaintiff did not assert ownership at that time.

ORDERED that plaintiff's motion for partial summary judgment is denied, and it is further

ORDERED that defendant United States of America's motion for summary judgment is granted, and it is further

ORDERED that judgment is entered for defendants.